## Commonwealth *against* Shaver.

The trial, conviction, and sentence of one who holds the office of sheriff of the offence of bribing a voter previously to his election to the office, is not such a "conviction of misbehaviour in office, or of any infamous crime," as will disqualify him from exercising the duties of his office, as provided by the 9th section of the 6th article of the Constitution.

*QUO WARRANTO.* The Commonwealth of Pennsylvania, at the suggestion and on the relation of Jacob Africa against John Shaver.

In October 1841, John Shaver was duly elected to the office of sheriff of the county of Huntingdon, and was duly commissioned by the Governor on the 3d of November 1841. On the 1st of November 1841, a prosecution was commenced against Shaver for bribing Christian Couts, before his election, to vote for him and support him for the office of sheriff. At January sessions 1842, he was tried and convicted; and at April sessions following, sentenced " to pay a fine of $100 to the commonwealth, for the use of the county of Huntingdon, the costs of prosecution, and be imprisoned in the jail of that county for one month, and be in custody until this sentence be complied with; and ordered by the court that John Simpson, coroner of the county, take John Shaver, the sheriff, into custody, and that he execute the said sentence upon him; and for this purpose the sheriff is ordered to deliver to the said coroner the keys of the jail of the said county, and the clerk of the sessions is ordered to certify said sentence to the coroner."

[Commonwealth v. Shaver.]

Whereupon, on the 18th of April 1842, his excellency, the Governor of Pennsylvania, issued the following *supersedeas* to the commission of John Shaver:

"Whereas, by a commission under my hand and the great seal of the State, bearing date at Harrisburg 1841, you, the said John Shaver, were duly commissioned sheriff of the said county, having been first returned according to law; and whereas, at the January sessions of the Court of Quarter Sessions of the said county, you, the said John Shaver, were tried and convicted of a misdemeanour; and subsequently, to wit, on the 16th of April 1842, sentenced by the same court to pay a fine of $100 to the commonwealth, for the use of the said county, that you be imprisoned in the jail of said county for one month, as the law directs, pay the costs of prosecution, and be in custody until the sentence be complied with. Now, know you, that by virtue of the power and authority vested in me by the constitution and laws of this commonwealth, and for the causes above stated, it fully appears to me that you have not behaved yourself well in said office, and that you ought not any longer to exercise the said office of sheriff conferred upon you by virtue of such commission, I, David R. Porter, Governor, &c., do hereby revoke, annul, and supersede the aforesaid commission to you, bearing date the 3d of November 1841, and all and every of the powers, rights and duties incident thereto, and thenceforth you exercise or perform any of the duties of sheriff of said county of Huntingdon, or by virtue of the commission aforesaid, or to take any of the fees or emoluments which shall appertain to said office. Given under my hand, &c., this 18th of April 1842."

Notwithstanding, John Shaver continued to exercise the office and duties, and receive the emoluments of the office; whereupon this writ of *quo warranto* was sued out.

*Attorney-General Johnson,* with whom was *Ayres,* for the relator, argued that the respondent never was rightfully the sheriff of Huntingdon county; that his election and commission were fraudulently obtained by means of corruption, and therefore he could not lawfully exercise the office. The Governor was bound, under the 9th section of the 6th article of the constitution, to supersede the commission which he had previously granted, both on the ground of his having been convicted of a misdemeanour in office, and of an infamous crime — that of bribery.

*Miles* and *Bell, contra.* It is too clear to admit of argument, that the respondent has not been convicted of a misdemeanour in office; the only question is, has he been convicted of an "infamous crime?" The offence of which the defendant was convicted was one created by an Act of Assembly, and is not thereby made infamous. Bribery is only an infamous crime when it affects the

[Commonwealth v. Shaver.]

administration of justice. 1 *Phil. Ev.* 22 ; 2 *Russ. on Crimes* 534 ; 3 *Burr.* 1338, 1387, 1440 ; 3 *Wash. C. C.* 99 ; 21 *Eng. Com. Law Rep.* 483 ; 1 *Russ. on Crimes* 122 ; 2 *Mass.* 108 ; 4 *Mass.* 162.

The opinion of the Court was delivered by

KENNEDY, J.—The point to be decided in this case arises out of the 9th section of the 6th article of the constitution of the State, which is in the following words : " All officers for term of years shall hold their offices for the terms respectively specified, only on the condition, that they so long behave themselves well ; and shall be removed on *conviction of misbehaviour in office,* or of any *infamous crime.*" It is very clear that sheriffs, as well as all other officers holding their respective offices for a term of years only, are embraced within this provision of the constitution, so that the respondent, though duly elected and commissioned to the office of sheriff, cannot claim to hold it after he has been *convicted of misbehaviour in it,* or of any *infamous* crime. But has he been convicted of either the one or the other of these offences, *is the* question which remains to be solved. As to misbehaviour in office, it is perfectly manifest that he has not even been charged with, much less convicted of it. But it has been urged, and indeed strenuously, too, on behalf of the commonwealth, that he has been *convicted of an infamous crime.* That he has been convicted of an offence of great public concern, cannot be denied. For it unquestionably is of vital importance to the best interests of the republic, that the purity and freedom of the election of all its officers should be preserved, and kept free from every species of improper bias or corruption. In order, however, to determine whether the crime, of which the respondent has been convicted, be *infamous,* within the meaning of the constitution, or not, it becomes necessary to examine and ascertain first, what the framers and makers of it meant by the words " infamous crime." For although we may think that the offence of which the defendant has been convicted, is such as ought to disqualify him for holding the office, yet we are not to let our private feelings or sentiments influence or govern us in deciding this point. Instead of submitting to such an influence, it is our bounden duty, after a careful examination of the question, to determine it according to what we believe was intended by the makers of the constitution, which must be regarded as the law on the subject. Before proceeding, however, to ascertain this, it may be proper to observe, that we have no Act of Assembly which goes to render the commission of the respondent void, for or on account of the offence committed by him. Whether, therefore, his commission can be considered void, or he removed from his office by reason of his having committed and been convicted of the offence of bribery in canvassing for it, depends entirely upon the true meaning and import of the words of the constitution in respect to the same. If, upon examination,

[Commonwealth v. Shaver.]

it shall be found that the words " infamous crime" have received, in law, a fixed and definite meaning, it will certainly furnish strong, if not conclusive ground, for holding that such must have been the meaning which the makers of the constitution intended should be affixed and given to them.   And more especially ought we to come to this conclusion, if it shall be found impracticable to discover and lay down any other rule, by which crimes may be determined with reasonable certainty to be *infamous* or otherwise. For although an officer may, in a popular sense, be said to have rendered himself *infamous* by the general tenor of his immoral conduct, without having rendered himself liable to a criminal prosecution and punishment at law, yet it is very clear that the makers of the constitution did not intend that the word " infamous" should be applied *to* any officer, so as *to* cause him *to* be removed from office, however immoral his conduct may have been, unless he has been guilty of some offence that is made punishable by law; because, by the express terms of the provision, he is not to be removed from office without a previous *conviction*, which can only be when the offence committed by him is such as is made punishable by law.   He may therefore have become *infamous* in the general estimation of the world, by having rendered himself *odious* and *detestable*, which is one of the meanings given by Mr Webster in his dictionary, to the word " infamous," without having made himself liable to a prosecution and conviction at law for his misconduct.   Indeed he may be so notoriously and entirely destitute of truth, as to be altogether unworthy of credit, even when called to testify on oath, and yet never have been guilty of perjury, or any other indictable offence.   In short, there are also many evil practices of which a man may be guilty, beside that of lying, which may be said to lie at the root of almost all moral obliquity, for which he cannot be indicted or punished by law, and yet they are sufficient to render him *infamous* in the estimation of the more intelligent and virtuous portion of the community. They are so numerous, it would be difficult to enumerate them all; and at the same time so various, that there might probably be some diversity of opinion whether they ought to be regarded as attaching *infamy* to the person.   But since, according to the express terms of the provision in the constitution, it is only on *conviction* of the officer, either of *misbehaviour* in his office, or of some *infamous crime*, that it is declared he shall be removed from his office, it would, therefore, seem as if the makers of the constitution intended that the law, in force for the time being, should determine whether the crime was *infamous* or not.   If this had not been intended, it is reasonable to conclude that they would have given some explanation of what they meant by the term " infamous;" but not having done this, we are left to infer, very fairly, that they intended to use it in its legal acceptation, which was settled and known, and therefore rendered all explanation

[Commonwealth v. Shaver.]

unnecessary. Besides, the words "infamous crime" are properly a legal phrase, and are therefore to be taken in their legal sense, unless from the context it appeared that such was not the intention, which cannot even be pretended to be the case here; but the contrary would seem to be most clearly indicated by the use of the word *conviction*.

It becomes necessary, now, to ascertain the legal import of this phrase. Mr Webster, who, in his Dictionary, adopts the meaning given by the Encyclopedia to the word "infamy," says, "in law," it means "that loss of character, or public disgrace which a *convict* incurs, and by which he is rendered incapable of being a *witness* or *juror*." And accordingly, in *Tomlin's Law Dictionary*, in explaining the same term, it is laid down that *infamy* extends to forgery, perjury, gross cheats, &c., and disables a man to be a witness or juror. It has unquestionably been clearly settled, that the conviction of a person of an *infamous crime*, renders him incompetent to be a witness thereafter; but the conviction of a crime, considered not infamous at common law, has never been held, unless by statute, sufficient to disable him from being a witness. See *Co. Lit.* 6 *b*; *Com. Dig. Tit. Testimony, A.* 3, 4; *Clancey's Case,* (*Fortescue's Rep.* 208); *Baring* v. *Shippen,* (2 *Binn.* 165); 1 *Phill. Ev.* 24, 25; *Bushel* v. *Barrett,* (*Ry. & Moo.* 434); *S. C.* 21 *Eng. Com. Law* 483. The offences which disqualify a person to give evidence, when convicted of the same, are treason, felony, and every species of the *crimen falsi* — such as forgery, perjury, subornation of perjury, attaint of false verdict, and other offences of the like description, which involve the charge of *falsehood, and affect the public administration of justice.* 2 *Hale P. C.* 277; *Com. Dig. Tit. Testm. A.* 3, 4; *Co. Lit.* 6 *b*; 1 *Phill. Ev.* 20, 21, 22; 2 *Russell on Crimes,* 502, 503. So bribery, taken in a somewhat restricted sense, may be regarded as an *infamous* offence; and for that reason, renders the party convicted of the same, an incompetent witness; as, for instance, in the case of receiving or offering any undue reward by or to any person whatsoever, whose *ordinary profession* or *business relates* to the *administration of public justice,* in order to *influence his behaviour in office,* and *incline him to act contrary to the known rules of honour and honesty.* 1 *Hawk. P. C. cap.* 67, *sec.* 2; 3 *Inst,* 145; 4 *Bl. Com.* 139; 1 *Russell on Crimes* 156. Though in *Clancey's Case,* (*Fortescue's Rep.* 208), where, after great deliberation, a conviction of bribing a witness to absent himself and not give evidence, was held to be an *infamous* offence by seven of the Judges, and for that reason rendered the party incapable of giving evidence, that great and distinguished Judge, Lord Holt, then Chief Justice of the King's Bench, doubted the propriety of the decision. The ground of the decision in *Clancey's Case* was, that the purpose of the bribery was to *obstruct and pervert the administration of public justice,* by preventing the truth from being made known. The

[Commonwealth v. Shaver.]

same ground was adopted in a late case of *Bushell* v. *Barrett*, (*Ry. & Moo.* 434); *S. C.* 21 *Eng. Com. Law* 483. In this latter case, the objection to the witness was, that he had been convicted of a conspiracy to bribe a person, summoned as a witness, (on an information against the revenue laws), not to appear before the justices of the peace, who were to investigate the matter and decide on it; and held by the court, according to the principles of *Clancey's Case*, that he was rendered incompetent by the conviction. And it is perfectly clear, from what the court say in this latter case, as also in the case of Clancey, that it was not because the party had been convicted of bribery or a conspiracy to bribe, that he was rendered infamous, and therefore incompetent to give evidence; but because he had become so, on account of the object that was intended to be effected by means of the bribery, which was that of *obstructing and perverting the administration of public justice.* But corrupt and illegal practices in giving rewards or making promises, in order to procure votes in the elections of members to serve in Parliament, although in a more extended sense denominated bribery, and punishable at common law, (*Rex* v. *Pitt*, 3 *Burr.* 1335, *per Lord Mansfield*), have never been held to render persons, convicted thereof, infamous or incapable of giving evidence or serving as jurors. Indeed, I think I may say, it has never occurred to any one to make the objection as founded upon the principles of the common law; which, of itself alone, is very powerful, if not conclusive evidence, to show that such corrupt and illegal practices were never considered *infamous crimes.* Statutes, however, have been passed in England, as also in some of the United States, rendering persons, convicted of bribery at elections, incapable of holding thereafter any office or franchise, or of voting at the same. See 1 *Russell on Crimes*, 156, *and note A*, (*Philad. edit.* 1836). The passage of these statutes also furnishes strong evidence that a conviction at common law, in such cases, did not work any disqualification to hold office or give evidence; otherwise the passage of them would have been unnecessary.

But it has been said, by the counsel for the commonwealth, that it properly belongs to the Governor to settle and decide the question that is presented here; that he has already determined that the defendant, by reason of his conviction, is no longer entitled to hold the office of sheriff; and that the decision of the Governor, thus made, is binding and conclusive upon this court. It would seem that the Governor did entertain the opinion that the defendant had become incapable of holding the office; but whether for the same cause that is now assigned on the part of the commonwealth, may be questionable, because we have before us a copy of what is called a *supersedeas*, issued by him, bearing date the 18th of April 1842, directed to the defendant, wherein, after reciting that the defendant had been duly commissioned sheriff of the

county of Huntingdon, and that he, afterwards, had been convicted at January sessions 1842, of the Court of Quarter Sessions of said county, of a misdemeanour, and sentenced by the said court on the 16th of April 1842, only two days anterior to the issuing of the *supersedeas,* to pay a fine of $100 and to undergo an imprisonment for one month in the jail of said county, the Governor declares, that *for the cause thus stated,* it fully appears to him that the defendant *had not behaved himself well in the said office,* and therefore ought not any longer to exercise the said office of sheriff conferred upon him; and then he (the Governor) thereby revokes, annuls, and supersedes the defendant's commission of sheriffalty. Now it is very apparent, from the face of the *supersedeas,* that the Governor had been given to understand, in some way or other, that the defendant had been *convicted of misbehaviour in office;* for he says expressly, that it appeared fully to him, from the conviction, which he recites as being of a misdemeanour, that the defendant *had not behaved himself well in his said office of sheriff.* Whereas it appears plainly, from the exemplification of the record produced here, of the only conviction that is alleged to have taken place against the defendant, that it was *not for misbehaviour in office,* or anything of the sort, but for bribing an elector to vote for him as a candidate for the sheriff's office, before he obtained it. Hence I am inclined to believe, that the Governor could not have derived his information of the conviction, upon which he acted, from a regularly certified copy of the record thereof, which ought to have been furnished to him, or otherwise he would not have fallen into such an error, it being one of fact simply, which required no legal knowledge or acumen in order to guard against it. Then, supposing it was a matter upon which he was authorized to pass conclusively, it would appear that he decided upon a case altogether different from that which is presented to us; and it would seem to have been one, too, which never existed; and therefore cannot be considered as having any effect upon the present. But the Governor's action in the case cannot be said to partake, properly speaking, of a judicial character; for it was *ex parte,* without any previous notice whatever to the defendant; and it would therefore be unreasonable in the extreme, to regard it as conclusively binding upon the rights of the defendant. Beside, I am not satisfied that the Governor has any power to issue any other species of *supersedeas,* when a vacancy takes place in the sheriff's office, than that of a new commission to fill it until the next general election; which he is authorized to do by the first section of the sixth article of the constitution. This, at least, I think, may be considered as the only *supersedeas* which he is *expressly* authorized to issue by the constitution. The argument that the defendant's confinement, under the sentence of the court, which followed his conviction, rendered it impracticable for him to execute the duties of his office in person, and therefore he ought to be con-

[Commonwealth v. Shaver.]

sidered as virtually removed from it, does not seem to merit notice; for, as well might the same effect be said to have been produced, if his confinement had been caused by sickness. In either case, all the duties that could not be performed by him personally, he would have discharged by his deputy. Nor is the argument that the defendant could not have the charge of the jail of the county, while he was himself a prisoner in it, seeing this would have been leaving it to his own will to have his sentence carried into effect or not, as he pleased, entitled to any greater respect; because it was altogether feasible for the coroner, who had the defendant in charge, to have an exclusive control over part of the jail for that purpose; or, if the building used as a jail, in the county, would not admit of that, he could, as it would have been his duty, have procured an apartment in another building, or the whole of another building, if requisite, for the purpose of confining the defendant in it. For the jail in a county does not, of necessity, consist of one entire building alone; two, or more, may be obtained and occupied for that purpose, whenever the exigency of circumstances, whether accidental or otherwise, shall render it necessary. Judgment is, therefore, rendered for the defendant, and that he recover his costs of Jacob Africa, the relator.

Judgment for the defendant.