## DETERMINED IN THE

# THIRD DEPARTMENT,

### AT

# GENERAL TERM,

### November, 1881.

---

THE PEOPLE OF THE STATE OF NEW YORK EX' REL.
TIMOTHY F. BUSH, RESPONDENT, v. WILLIAM L. THORN-
TON, APPELLANT.

*Bribery — when it rests upon the people to show that individual voters were bribed —*
*the bribery does not disqualify the party guilty of it from holding office — nor*
*does his inability to truthfully take the oath of office disqualify him from holding*
*the office.*

This action was brought by the people to oust from his office a county judge who
had received the highest number of votes cast at the election, and who had,
after receiving the certificate of the board of county canvassers, taken and
subscribed the required oath of office, upon the ground that prior to the elec-
tion he had publicly promised the electors of the county that he would, if
elected, perform the duties of his office for $1,300 less than the amount of his
salary as fixed by the statute.

*Held,* that all votes cast for the defendant under the influence of such promise
were illegal, and in a proceeding in the nature of a *quo warranto* against him
should be rejected.

That in such proceedings it was incumbent on the relator, in order to have judg-
ment of ouster against the defendant, to prove affirmatively that of those who
voted for him a number equal at least to the majority certified in his favor
cast their votes for him under such improper influence.

That neither the bribing of electors nor the offer to them of a bribe by a person
receiving the certificate of election would render him ineligible or disqualify
him from holding office, in the absence of a constitutional or statutory pro-
vision declaring such disability.

Nor in like case would the fact that he could not truthfully take the oath of
office render him ineligible.

Appeal from a judgment in favor of the plaintiff, entered upon the trial of this action by the court, without a jury.

*Thornton A. Niven*, for the appellant.

*T. F. Bush*, for the respondent.

Bockes, J. :

The facts in this case on which the questions of law involved in it must turn should, as I think, be briefly stated. The relator and the defendant were rival candidates for the office of county judge of Sullivan county at the general election in November, 1878, and were the only candidates in nomination and voted for at that election, save as there were a few votes for that office returned as scattering, not necessary to be here noticed. By the certificate of the board of county canvassers it was declared that the whole number of votes cast at that election for the office of county judge was 6,179, of which number 3,211 were for the defendant and 2,947 were for the relator. The defendant was declared to be duly elected, and the certificate of his election was awarded to him in due form. Thereupon he took and filed the requisite oath of office and January 1, 1879, entered upon the duties of the office. He continued to perform the duties of the office until the commencement of this action in December, 1879, and, also, until ousted therefrom by the judgment herein January 21, 1881. The salary of the office at the time of the election was, and for six years next preceding that time had been, fixed by law at $2,500.

The facts relied on as a basis for the judgment of ouster were the following, to wit : Preceding the election and in view of his candidacy the defendant made public, general and repeated promises and pledges to the electors of the county that he would, if elected, accept $1,200 in full for his services as county judge ; and he issued a card directed to them and gave it circulation and publicity throughout the county, which card was as follows :

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

" I here repeat that if elected to the office of county judge I will pledge myself to take only $1,200 for my services; that I will pay out of my own pocket the coal necessary to heat my law office ; that I will pay for all stationery and letter heads, and will see that those

persons needing blanks shall pay for them themselves. If by so doing I have committed a criminal offense let Judge BUSH make the most of it by lodging a complaint against me before the next grand jury.

Has heaping on taxes become a virtue in this county, and an attempt to reduce them become a crime? Let the people answer.

W. L. THORNTON."

He also executed a bond with two sureties to the treasurer of the county in the penal sum of $10,000, whereby he bound himself, if elected, to perform the duties of county judge for $1,200, and that in case the supervisors should persist in raising the balance of $1,300 this sum should be turned over to the poor fund to the credit of the county. And this sum having been raised for the year 1879 he placed it to the credit of such fund as he had promised he would do.

As above stated the defendant received the highest number of votes for the office, and was by the board of county canvassers awarded the certificate of election in due form and on the 27th of November, then next following, he took and subscribed the oath of office as follows:

STATE OF NEW YORK, ⎱ *ss.:*
   COUNTY OF SULLIVAN, ⎰

I do solemnly swear that I will support the Constitution of the United States and the Constitution of the State of New York, and that I will faithfully discharge the duties of the office of county judge and surrogate, in and for said county, according to the best of my ability.

And I further solemnly swear that I have not directly or indirectly paid, offered or promised to pay, contributed or offered, or promised to contribute any money or other valuable thing as a consideration or reward for the giving or withholding a vote at the election at which I was elected to said office, and have not made any promise to influence the giving or withholding of any such vote.

WILLIAM L. THORNTON.

Sworn before me, this 27th day ⎱.
    of November, 1878. ⎰

G. PENDELL, *Dep. Clerk.*

Some evidence was given in regard to the number of votes on the poll-lists and tax-rolls of the towns of Fallsburgh, Liberty and Rockland, but this evidence was deemed of no importance in the view taken of the case by the learned judge before whom it was tried.

No proof was given on the trial, nor was any offered showing or tending to show by *just legal intendment* that any vote was cast for the defendant by reason of his promises and pledges to accept $1,200 for his services in case of his election ; the learned judge holding in effect that such proof was wholly unnecessary to the establishment of the case against the defendant as charged. On this subject the learned judge said : " I am aware that there is no evidence from any witness who voted at the election for the defendant that he did so in consequence of such pledges and promises. This I regard immaterial, and so stated at the trial when the relator proposed to give evidence of such a character;" and the case was determined, in one view of it, upon the correctness of this conclusion. This presents one of the questions for our consideration on this appeal.

The learned judge also further held that by making and publishing the promises and pledges above alluded to, to the voters of the county, with intent to procure votes thereby, the defendant rendered himself incapable of truthfully subscribing and taking the oath of office prescribed by the Constitution; and, as matter of law, that the taking and subscribing the oath was null and void, and that he was in no better position to retain the office and to discharge its duties than if he had neglected to take the oath; and, further, that by rendering himself incapable of truthfully taking the oath of office, he became ineligible and incapable of entering into and holding it. These conclusions present another question here for our determination.

In the first place let us notice the precise legal position of the defendant as his case is presented on admitted facts.

He was charged by a direct proceeding in the name of the people, by the attorney-general, with unlawfully intruding himself into the office of county judge, and he was called upon to show by what right and authority he held and exercised the functions of that office. Thus he was required in due form of law to show his right

to the office. Now, in the first instance, the burden of proof was on the defendant. He was bound to show his title to the office. This requirement was met and answered by the production of the record of his election, made and filed by the proper officers, showing his due election to the office, and also by proof that he had subscribed and taken the requisite oath. It was averred and admitted in the pleadings that he held a certificate of election from the board of county canvassers in due form, and correctly made from the regular returns of the votes cast at the election. This certificate declared him to have been duly elected to the office according to law. This was his muniment of title to the office, and was a perfect protection to him against the charge of usurpation, so long as its integrity and validity remained unimpeached. On this state of facts the case was with the defendant, and now the burden of proof was cast upon the relator to show that the former held and exercised the right of office without authority of law, notwithstanding he held the certificate of his election in due form. The correctness of this conclusion is well supported by authority, if indeed any were necessary on so plain a proposition. (*The People* v. *Cook*, 8 N. Y., 67; *The People* v. *Pease*, 27 id., 45, 55; *The People* v. *Thacher*, 55 id., 525; *Phelps* v. *Schraw*, 26 Ohio St., 550.) These cases and many others hold that the certificate of election, duly made and filed according to law, establishes the right of the party named in it to the office as therein declared. True, it is but *prima facie* evidence of his right and title, but it remains his perfect protection until its correctness is overthrown or its integrity impeached. How may this be done? This inquiry is answered by the decision in *The People* v. *Pease*, above cited, where it is held that upon a trial of a *quo warranto* to determine the title to an office depending upon a general election, the question is, who received the most legal votes? It is, then, to this subject that our examination must be here directed. It is made to appear from the pleadings and proofs that the whole number of votes cast for county judge in the county was 6,179; of which number the relator received 2,947 and the defendant 3,211, scattering or disallowed twenty-one; showing a majority of 264 in favor of the defendant over the relator. Now, is it made to appear that there were 265 or 264 illegal votes counted for the defendant? It was laid down in *Ex parte Murphy* (7 Cow.,

153), that the fact should be shown affirmatively that a sufficient number of improper votes were received for the successful party to reduce it to a minority if they had been rejected; or the election should stand. In *The State* v. *Olin* (23 Wis., 309), it was held that the burden of proof was upon the party denying the legality of a vote actually cast, and that this rule applied to a vote obtained by bribery. And, again, in *The State* v. *Purdy* (36 Wis., 212), a case very similar on the facts to this in hand, the learned judge, in concluding his very elaborate and able opinion, says : " It follows from the foregoing views that if the defendant succeeds in showing, as he alleges in his answer, that a number of the electors, exceeding the majority of the relator, were influenced to vote for the latter solely by reason of the offers or propositions made by him as aforesaid, *the votes so obtained should be rejected.*" Now, it is conceded that there is no proof, in any individual instance, that an illegal vote was given to or counted for the defendant ; yet the entire number of 3,211 votes cast for him at the election was rejected by the court, and on the ground that it was to be presumed that enough of them were invalid or illegally cast to overcome his majority, because of his general public promises and pledges made to the voters that he would, if elected, perform the duties of the office for $1,300 less than would be allowed him by law. This ruling, we think, was erroneous. In effect, it was a rejection of the entire vote given to him with no affirmative proof that a single illegal vote was cast for him. The presumption indulged and acted upon by the court at Special Term was as effectual against the whole as against any one vote. If there was any admission or proof which would operate to render any one specific vote illegal, the same existed in this case as to all, and all alike should be held to be illegal, there being no proof that any one vote was cast uninfluenced by the defendant's promises and pledges. Indeed, this was the effect of the decision at Special Term. But there was in fact no evidence showing, either positively or by fair and just legal intendment, that even one illegal vote was cast for the defendant at the election. Grant that his promises and pledges should be considered as the offering of a bribe for votes, and there is no proof that any voter accepted the bribe by casting his vote on the faith, or by reason of the illegal offer. It cannot be fairly presumed that a person committed an offense on

proof simply that he was tempted. The court should not presume, in the absence of any satisfactory evidence of the fact, that any voter acted in giving his vote both immorally and criminally. This was a matter to be proved — a fact to be substantiated by competent evidence — before it could be made the basis of judicial action. The offer of a bribe to a voter, with no evidence that he accepted the offer, should not be held to disfranchise him. So it should not be held that the *offer of a bribe* generally to the electors of the county, with no proof of its acceptance by any one, disfranchised all or any such persons as voted in accordance with the request or wishes of the party tendering the bribe. It is very manifest that such disfranchisement would work a great wrong. It would deprive honest voters of their just rights as good and faithful citizens. It was said in *The People* v. *Cicott* (16 Mich., 305) : "No voters who have honestly voted ought to lose their ballots unless it is impossible to give them effect." In this case it may seem highly *probable* that some of the electors accepted the alleged bribe and gave the defendant illegal votes. This, however, is not made certain either by direct proof of the fact or by fair and necessary legal intendment. But admit the *probability* to exist, then to how many, to what number of the electors, will even such probability apply ? Not to the entire number cast for the defendant, being a majority of the electors of the county. Such conclusion would be most startling, manifestly most unreasonable and unjust. Then where can the line be drawn with such legal certainty as to make it a basis of judicial action ? No more at number 264 or 265 than at any higher or lower number. Then it cannot be said that it is affirmatively established that a sufficient number of illegal votes were counted for the defendant to place him in a minority had they been rejected.

The certificate of election held by the defendant therefore remained unimpeached, as there is no suggestion of mistake, irregularity or fraud either in the returns made by the inspectors of election from the several election districts, or in the ultimate canvass by the board of county canvassers. It is not disputed that the board of canvassers made a true statement of the votes, and of all of them, cast at the election, and for whom given. There is no pretense of mistake, error or irregularity committed by the inspectors of election at an election district, as was charged and made a subject of

examination in *The People* v. *Thacher*, and in *The People* v. *Cook*, above cited, and also in *The People* v. *Saxton* (22 N. Y., 309). Indeed the truthfulness of the certificate is not denied; that is, it is not disputed that the board of county canvassers truly certified the exact number of votes cast at the election and for whom cast; and that on allowing the votes to the respective parties, as in fact given at the polls, the defendant had a majority of 264 over his competitor for the office. Therefore, in the absence of affirmative proof that there were at least 264 illegal votes (that is, in this case, at least 264 votes cast by bribed voters) allowed to the defendant in the county canvass, the judgment of ouster against him cannot be sustained on the ground that he did not receive a majority of the legal votes cast at the election.

Relying upon this ground as a basis for a judgment of ouster against the defendant, the relator must make the affirmative proof above indicated or fail in the action. (*Ex parte Murphy*, 7 Cow., 153; *The People* v. *Pease*, 27 N. Y., 45, 55, 56; *The People* v. *Thacher*, 55 id., 525; *The State* v. *Olin*, 23 Wis., 309; *The State* v. *Purdy*, 36 id., 213.)

The next question demanding our attention is this: Whether the promises and pledges made by the defendant to the electors of the county, to the effect that if elected to the office of county judge he would perform the duties of the office for $1,300 less than the amount fixed by the statute for such services, disqualified him from taking and holding the office; in other words rendered him ineligible to its acceptance.

The rights to hold office and to exercise its functions and to enjoy its honors and emoluments constitute the highest privileges of citizenship. In our form of government these rights inhere in every male citizen of full age, unless incapacitated to have and enjoy them by reason of some express provision of the Constitution or law; and the courts cannot take those rights away save by virtue of a declared power of disfranchisement based on some specified wrongful or criminal act. Wrong doing or criminal conduct which will constitute or work ineligibility, or disability to hold office, to be enforced through the judicial power of the State must be expressly defined and declared by the Constitution or laws. Granting, then, that the promises and pledges made by the defendant to the electors of

the county in this case constituted an offer of a bribe to them to cast their votes for him, where in the Constitution or in the law is such offer declared to create ineligibility to office ? We do not find it to be so declared in terms either in the Constitution or laws of this State. The offer of a bribe to an elector is unquestionably a grave offense and is punishable as such, but it is punishable only in the manner and to the extent prescribed by the Constitution and laws. Section 2 of article 2 of our State Constitution excludes from the right of suffrage every person who shall either accept or offer a bribe for the giving or withholding of a vote at any election. And by statute bribery of an elector as well as the offer to him of a bribe, having in view the influencing of his vote, is made a misdemeanor punishable by fine and imprisonment. Such are the penalties prescribed by the Constitution and laws of our State against those offenders. But they are not declared to be also ineligible to office, or to be disqualified from holding office. Now it is a canon of construction applicable alike to constitutions and laws relating to criminal or *quasi* criminal matters, that when either defines an offense and imposes a penalty therefor, the specification of such penalty is an implied prohibition against all additional punishments and forfeitures. In *The State* v. *Pritchard* (36 N. J., 101, 105) it was insisted that inasmuch as the law prohibited a convict from being a witness in a judicial proceeding, and in consequence thereof the Constitution deprived him of the right of suffrage, as a necessary result there was a deprivation also of the prerogative to hold office. BEASLEY, Ch. J., answered that this was a manifest *non sequitur*. The learned judge added : " Because as a punishment the law has denounced the loss of two of the rights of citizenship it does not follow that a third right is to be withheld from the delinquent." And, further, he says : " Indeed the reverse result is the reasonable deduction, because it is clear on common principles that no penalty for crime but that which is expressly prescribed can be executed. The fact that several penal consequences are annexed by statute to the commission of a breach of the law cannot warrant the aggravation by the judicial hand of the punishment prescribed." And DANFORTH, J., in *Bonnell* v. *Griswold* (80 N. Y., 135), says : " I cannot imply a term into a statute for the purpose of extending or imposing a penalty."

It follows, therefore, that no punishment or forfeiture can be imposed by the court upon the defendant for the offense here claimed to have been established against him, other than such as are prescribed by the Constitution and laws. These do not embrace disqualification to hold office for the offense here alleged.

This conclusion disposes of the suggestion that disqualification to hold office, although not within the letter is within the spirit of the provisions of the Constitution and laws, which prescribe penalties and forfeitures against persons guilty of the offense of bribery at elections. The cases to which we are cited in support of this suggestion (*The People* v. *Allen*, 42 N. Y., 404, and *The People* v. *Albertson*, 55 id., 50) have here no application, as it is entirely manifest that disqualification to hold office is not, by any fair construction, within the intent of the Constitution and laws denouncing penalties and forfeitures against bribery at elections. What was intended by the Constitution and laws in that regard is specifically and distinctly stated in them, and by settled principles of construction the penalties and forfeiture there prescribed cannot be added to or enlarged by intendment. Nor has the statute, which declares that an office shall become vacant in case the incumbent shall be " convicted of an infamous crime, or of an offense involving a violation of his oath of office " (1 R. S. [6th ed.], 420, sub. 5 of § 40), any application here. The conviction there alluded to means a conviction by a direct proceeding against the incumbent on criminal indictment. There is no pretense that the defendant has been so convicted. (See, also, *Cane* v. *Shaver*, 3 Watts & S., 338.)

We are also cited to cases where persons have been excluded from public bodies for bribery in procuring their appointment or election thereto, but in those cases such bodies were empowered to determine questions of membership. Those cases do not touch the question of disability to hold office presented to the court on a proceeding by or in the nature of a *quo warranto*.

It is strenuously urged by the defendant's counsel that the promises admitted to have been made by the defendant to the electors of the county, that if elected he would perform the duties of the office of county judge for $1,300 less than the sum fixed by law for such services, were not offers or an offer of a bribe within the meaning of the Constitution; that they constituted a pledge merely to cor-

rect a subject of just complaint made by the people against what they deemed an oppressive legislative burden upon them ; that the promises were made in the interest of a just reform, with no criminal intent.   But this argument seems to be borne down by the weight of authority.   In view of the numerous cases, both in England and in this country, in which the subject of selling offices and of the bidding for offices has been under discussion, we must hold such promises and pledges as were made by the defendant to the electors of the county in this case to be reprehensible in the extreme, being against public policy, and in fact criminal, being no less than an offer in the nature of an intended bribe to the electors to whom they were made.   In view of what has been said in the following cases, and in those therein cited, further examination of and comment upon this subject is quite needless: *Hall* v. *Gavitt* (18 Ind., 390); *Carrothers* v. *Russell* (63 Iowa, 346) ; *The State* v. *Purdy* (36 Wis., 213) ; *Walsh* v. *The People* (65 Ill., 58) ; *State* v. *Dustin* (5 Oregon, 375) ; *State* v. *Collien* (18 Am. Law Reg. [N. S.], Mo., 768) ; *State* v. *Stevens* (23 Kan., 465); *Tucker* v. *Aikin* (7 N. H., 113) ; *Carlton* v. *Whitcher* (5 id., 196) ; *Meredith* v. *Ladd* (2 id., 517) ; *Alvord* v. *Collien* (20 Pick., 418; *King* v. *Plympton* (2 Lord Raym., 1377) ; *Rex* v *Vaughan* (4 Burr., 2494) ; *Waldo* v. *Martin* (2 Carr. & Payne, 1.) These cases, as we think, warrant the conclusion that the promises made by the defendant to the electors were in violation of public policy, and indeed criminal, even by the common law.   But as herein above stated, they did not *per se*, and in the absence of all constitutional and legislative declaration, create as a penalty a disability to hold office.

In England bribery in procuring an office created a disability to hold it.   (5 and 6 Edw., 6, chap. 16 ; and 49 Geo. III, chap. 126.) In Iowa it is provided by law that an election to a county office may be contested " when the incumbent has given or offered to any elector    *    *    *    any bribe or reward in money, property or thing of value for the purpose of procuring his election."   *Carrothers* v. *Russell* (*supra*) was decided in view of that statutory provision.   In Kansas it is declared by constitution that "no person guilty of giving or receiving a bribe, or offer to give or receive a bribe    *    *    *    shall be qualified to vote or to hold office." The case of *The State* v. *Stevens* (23 Kan., 456) was a proceeding for *mandamus* and has no application to the question of disability

here under examination. In Oregon it is declared by constitution that "every person shall be disqualified from holding office during the term for which he may have been elected, who shall have given or offered a bribe, threat or reward to procure his election." It was in view of this provision that *The State* v. *Dustin* (*supra*) was decided. In Wisconsin the statute declares a disqualification to hold office against such persons as should obtain it by bribery; and in Ohio disqualification is declared by law. Research has not been further extended, and it may be that similar constitutional or legislative inhibitions may exist in some other States of the union. We have not in this State any similar provision, either in the constitution or laws. It may be here pertinently asked, what need of expressly declaring this inhibition in those States if it existed there, as it is claimed to exist here, without so declaring it? The disability was doubtless made constitutional in some States and was declared by law in others, under the belief, well founded too, as we think, that it was necessary to make such express declaration and provision in order to create the disability thus pronounced. We are cited to no case in which it has been held that disability to hold office exists in the absence of a constitutional or legislative provision so declaring.

The case of *The State* v. *Purdy* (*supra*), very much relied on by the relator's counsel, does not decide that disability in the party to hold office was created or caused simply by his attempt to bribe the electors; but the decision proceeded on the ground (unnecessary if the other could be vindicated) that the right of the contestants for the office depended upon the question as to which of them received the highest number of legal votes, holding those votes to be illegal on principles of public policy, and as cast in violation of law, which were given under the influence of the improper promises and pledges made to electors. We conclude, therefore, that in the absence of constitutional or statutory provision so declaring, that ineligibility to office or disability to hold office cannot be pronounced by the court because of bribery or attempting to bribe electors. Votes cast under the influence of a bribe proved to have been so given should not, on grounds of public policy and because of the criminality of the act, be counted; but this goes to the count—to the allowance of the vote—and does not touch the question of disability to hold office because of bribery. Whether a law declaring such

disability would or would not be just and politic in this State is a
subject for consideration by the legislative branch of the govern-
ment.   It is the business and duty of courts to enforce laws.   They
cannot make them, however desirable they may be or however great
the necessity for their existence.

It was further held, at Special Term, that the defendant was not
eligible to the office to which he was elected by the electors of the
county, because he could not *truthfully* take the oath of office ; that
because he could not truthfully take the oath of office he was in
no better position to retain the office and discharge its duties than
if he had neglected to take the oath.

This ruling we deem to be unsound.   Where, in the Constitution
or the laws of this State, is it declared that false swearing in taking
the oath of office disqualifies a person from holding the office to
which he was elected ?   We are not cited to any such constitutional
or statutory provision, nor are we aware of any.   Such false swear-
ing may be perjury, but the crime of perjury has certain pains and
penalties attached to it by law.   Can the court add to them any
others not declared either by the Constitution or laws ?   This ques-
tion is answered by our conclusion on the subject last above con-
sidered.   As has been already stated, it does not lie with the court
to enhance the pains, penalties and forfeitures provided by law for
the punishment of crime ; nor can it add any disability to these
pains and penalties not expressly declared by the Constitution or
laws.

Disability to hold office would follow indictment and conviction
of perjury, as the statute declares that an office shall become vacant
in case the incumbent shall be convicted of an infamous crime.

The law requires that a person elected to office shall take and sub-
scribe the requisite oath of office, and that if he shall omit so to do
within the prescribed period the office shall become vacant.   But it
does not further declare that the office shall also be deemed vacant
if the officers shall not swear to the truth in taking such oath, or
that he shall in that case be disqualified from holding the office.
The law denounces against the offender certain pains, penalties, for-
feitures and disabilities, and these, and none other, the court may
inflict and impose.   Thus we are of the opinion that the Special
Term was in error in holding the defendant was disqualified from

holding the office because he was guilty of false swearing in taking the oath of office. This, too, may be perhaps a very proper subject for consideration by the legislative branch of the government. The courts can, however, deal only with the law as it exists, without adding to it or detracting from it in order to meet exigencies not anticipated or provided for.

It follows that the judgment must be reversed.

BOARDMAN, J., concurred; LEARNED, P. J., concurred in the result.

Judgment reversed, new trial granted, costs to abide the event.