## Cullen Nominating Petition

*Walter Frederick Wall,* for M. Jean Lohr.
*Robert Davis Gleason,* for Frank M. Cullen.

HOWSARE, *P.J.,* March 26, 1991—This matter comes before the court by the petition of the Bedford County Republican Party and M. Jean Lohr seeking to have the nominating petition of Frank M. Cullen set aside. We held argument on Friday, March 22, 1991, and will by this memorandum render our decision.

Frank M. Cullen filed a nominating petition March 12, 1991, whereby he seeks election to the Office of Commissioner for the County of Bedford. Cullen is a dentist who maintains a practice in Bedford, in the course of which he participated in the Medicaid program through the Department of Public Welfare. On or about April 12, 1989, he tendered pleas of guilty to five counts of "Medicaid fraud," all classified as felonies of the third degree, pursuant to a plea agreement with the Office of the Attorney General. Specifically, Cullen pled guilty to violating section 1407(a)(1) of the Public Welfare Code which reads as follows:

"§1407. *Provider prohibited acts, criminal penalties and civil remedies*

"(a) It shall be unlawful for any person to

"(1) Knowingly or intentionally present for allowance or payment any false or fraudulent claim or cost report for furnishing services or merchandise under medical assistance, or to knowingly present for allowance or payment any claim or cost report for medically unnecessary services or merchandise under medical assistance, or to knowingly submit false information, for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise under medical assistance, or to knowingly submit false

information for the purpose of obtaining authorization for furnishing services or merchandise under medical assistance.''

Section 1407(b)(1) grades the offense and provides the penalty as follows:

''(b)(1) A person who violates any provision of subsection (a), excepting subsection (a)(11), is guilty of a felony of the third degree for each such violation with a maximum penalty of $15,000 and seven years imprisonment. . .

''(2) In addition to the penalties provided under subsection (4), the trial court shall order any person convicted under subsection (a):

''(i) to repay the amount of the excess benefits or payments plus interest or that amount at the maximum legal rate from the date payment was made by the Commonwealth to the date repayment is made to the Commonwealth;

''(ii) to pay an amount not to exceed threefold the amount of excess benefits or payments.

''(3) Any person convicted under subsection (a) shall be ineligible to participate in the medical assistance program for a period of five years from the date of conviction. . .''

The specific acts which Cullen committed are as follows:

(1) Submitted invoices to the Department of Public Welfare representing that fewer than six teeth were extracted from the mouth(s) of Medical Assistance recipient patients on each of several separate dates when, in fact, six or more teeth were extracted on a single date and no services were performed on the other dates specified in the invoices.

(2) Submitted invoices to the Department of Public Welfare representing that he had performed a root canal service on a certain date for a certain Medicaid Assistance recipient using an ''other than

paste" filling to fill the canals, when, in fact, he used a "paste" filling. Greater compensation is received for "other than paste" root canal filling.

(3) Submitted invoices to the Department of Public Welfare representing that he had performed restoration services on a greater number of tooth surfaces of certain Medical Assistance recipient patients then he had actually performed. Reimbursement is provided based upon the number of surfaces restored.

(4) Submitted invoices to the Department of Public Welfare representing that he had performed restoration services on a certain tooth for a certain Medical Assistance recipient on each of two or more separate dates, when, in fact, he performed a multi-surface restoration during a single visit.

(5) On other occasions submitted invoices to the Department of Public Welfare containing false information in order to receive greater compensation for services rendered to Medical Assistance recipient patients.

Cullen was sentenced on November 27, 1989, to 23 months probation, 300 hours of community service, fined $5,000, plus costs, and ordered to pay $35,754 in restitution to the Department of Public Welfare (three times the actual restitution of $11,918). He was suspended from participating in the Medicaid program from April 12, 1989, through April 12, 1994. To our understanding, he has now satisfactorily completed all conditions of the sentence and continues to practice dentistry in Bedford.

Article II, section 7 of the Constitution of this Commonwealth provides as follows:

"No person hereafter convicted of embezzlement of public monies, bribery, perjury or other infamous crime, shall be eligible to the General Assembly, or

capable of holding any office of trust or profit in this Commonwealth.''

Here petitioners contend that since Cullen has been convicted of violating section 1407(a)(1) of the Public Welfare Code, he has been convicted of an infamous offense, rendering him incapable of holding the office of county commissioner.

We will begin our discussion by defining the nature of our inquiry. Two basic principles are firmly entrenched in our democratic system of government and are basic to its effective operation. The first is that in the absence of some valid constitutional or statutory provision, there is no restriction upon the power of the people to elect any citizen to office notwithstanding his previous character or official misconduct. Second, the right to become a candidate to public office is a valuable and fundamental right and should not be prohibited or curtailed except by the plainest provisions of the law whether embodied in constitution or statute. With regard to matters coming within the scope of the Election Code of this Commonwealth, the law is clear that the code must be liberally construed so as not to deprive an individual of his right to run for office, or the voters of their right to elect a candidate of their choice. *Ross Nominating Petition,* 411 Pa. 45, 190 A.2d 719 (1963); *Tartaglione v. Graham,* 132 Pa. Commw. 578, 573 A.2d 679 (1990). We must recognize, therefore, that our duty is not to substitute our judgment for that of the voters of this county, but in a more narrow sense to determine whether Cullen's crime is an infamous crime. Justice Kennedy stated the proposition very clearly in 1842 in deciding the case of *Commonwealth v. Shaver,* 3 Watts & Serg. (1842). He wrote as follows:

"But it is urged, and indeed strenuously, too, on behalf of the Commonwealth that he has been convicted of an infamous offense. That he has been convicted of an offense of great public concern, cannot be denied. For it unquestionably is of vital importance to the best interests of the republic that the purity and freedom of the election and all its officers should be preserved, and kept free from every species of improper bias or corruption. In order, however, to determine whether the crime, of which the respondent has been convicted, be infamous, within the meaning of the constitution, or not, it becomes necessary to examine and ascertain first, what the framers and makers of it mean by the words 'infamous crime.' For although we may think that the offence of which the defendant has been convicted, is such as ought to disqualify him from holding the office, yet we are not to let our private feelings or sentiments influence or govern us in deciding this point. Instead of submitting to such an influence, it is our bounden duty, after a careful examination of the question, to determine it according to what we believe was intended by the makers of the constitution, which must be regarded as the law on the subject. . .. If, upon examination it shall be found that the words 'infamous crime' have received, in law, a fixed and definite meaning, it will certainly furnish strong, if not conclusive ground, for holding that such must have been the meaning which the makers of the constitution intended should be affixed and given to them."

We recognize the seriousness of this matter, not only to petitioners and Cullen, but to the credibility of this office and its proper functioning within our system of government, for our authority to declare him capable of holding public office, or not, depends on a proper determination of whether his crime is an

infamous crime. In that regard a review of the existing case law is somewhat enlightening.

The *Shaver* case decided in 1842 is the earliest authority available to us for reading, although reference is made in *Shaver* to earlier decisions. In *Clancey's Case,* (Fortesc. 208), it was held that bribing a witness to absent himself and not give evidence was an infamous offense, although "that great and distinguished Judge, Lord Holt, then Chief Justice of the King's Bench, doubted the propriety of the decision." The offense in *Clancey's Case* was found to be infamous because the purpose of the bribery was to obstruct and pervert the administration of public justice. The same reasoning was applied in *Bushell v. Barrett,* (Ry. & M. 434); S.C. 21 Eng.C.L. 483, decided after *Clancey's Case* but before *Shaver.* The *Shaver* case involved a set of circumstances which occurred in our neighboring Huntingdon County in the fall of 1841. In October 1841, John Shaver was elected sheriff of that county and received his commission from the government on November 31, 1841. On November 1, 1841, he was charged with bribing one Christian Couts to vote for him and support him in the election which put him in the sheriff's office. Shaver was tried, convicted and sentenced "to pay a fine of $100 to the Commonwealth, for the use of the County of Huntingdon, the costs of prosecution, and be imprisoned in the jail of that county for one month, and be in custody until this sentence be complied with;. . ." Although the Governor of Pennsylvania issued a supersedeas to the commission of Shaver, he continued to exercise the duties of his office. A writ of quo warranto was then brought. The decision rested on an interpretation of Article 6, section 9 of the Pennsylvania Constitution which read as follows:

"All officers for term of years shall hold their offices for those terms respectively specified, only on the condition, that they so long behave themselves well; and shall be removed on conviction of misbehavior in office, or of any infamous crime."

In deciding whether Shaver's crime was infamous the court stated as follows:

"It becomes necessary, now, to ascertain the legal import of this phrase. Mr. Webster, who, in his Dictionary, adopts the meaning given by the Encyclopedia to the word 'infamy,' says, 'in law,' it means 'that loss of character, or public disgrace which a convict incurs, and by which he is rendered incapable of being a witness or juror.' And accordingly, in Tomlin's Law Dictionary, in explaining the same term, it is laid down that infamy extends to forgery, perjury, gross cheats and disables a man to be a witness or a juror. It has unquestionably been clearly settled, that the conviction of a person of an infamous crime, renders him incompetent to be a witness thereafter; but the conviction of a crime, considered not infamous at common law, has never been held, unless by statute, sufficient to disable him from being a witness. The offenses which disqualify a person to give evidence, when convicted of the same, are treason, felony, and every species of the crimen falsi—such as forgery, perjury, subornation of perjury, attaint of false verdict, and other offenses of the like description, which involve the charge of *falsehood, and affect the public administration of justice.* So bribery, taken in a somewhat restricted sense, may be regarded as an infamous offense, and for that reason, renders the party convicted of the same, an incompetent witness; as for instance, in the case of receiving or offering any undue reward by or to any person whatsoever, *whose ordinary profession or business*

*relates to the administration of public justice, in order to influence his behavior in office, and incline him to act contrary to the known rules of honour and honesty. . . .* And it is perfectly clear, from what the court say in this latter case, as also in the case of Clancey, that it was not because the party had been convicted of bribery or a conspiracy to bribe, that he was rendered infamous, and therefore incompetent to give evidence; but because he had become so, on account of the object that was intended to be effected by means of the bribery, which was that of obstructing and perverting the administration of public justice." (citations omitted)

The court concluded by saying that although corrupt and illegal practices to procure votes amounted to bribery and was punishable at common law, the offense had never been held to render those convicted of it, infamous or incompetent to give evidence or serve as jurors. Shaver, it was held, had not committed an infamous offense and remained in office.

Few appellate cases in the intervening time have dealt with the issue. In *Commonwealth v. Knox,* 172 Pa. Super. 510, 94 A.2d 128 (1953), a duly elected Philadelphia magistrate was convicted of (1) violations of the Magistrate's Court, Act of June 15, 1937, P.L. 1743, as amended, 42 P.S. §1101 et seq.; (2) malfeasance, misfeasance, and nonfeasance; and (3) misconduct in office. He was sentenced to pay a fine of $500, undergo imprisonment for three months, and his office was declared forfeited and vacated. In its opinion the court stated as follows:

"Although appellant's offense affected the public administration of justice (see *Commonwealth v. Shaver,* 3 Watts & Serg. 338, 342) it was probably not an 'infamous crime' but most certainly it constituted 'misbehaviour in office.' "

Several cases have come from the county courts. In *Commonwealth v. Zavada,* 26 D.&C. 551 (1935), the Luzerne County court held that receiving stolen goods was not an infamous offense. John Zavada was elected in November 1931 to the office of councilman of Exeter Borough. On August 23, 1934, he was indicted for the offense of receiving stolen goods, and entered a plea of non vult contendere. His sentence was to pay the costs of prosecution, pay a fine of $50, make restitution and be imprisoned in Luzerne County prison for one to two years. It was contended that he was therefore disqualified to hold the office of councilman by virtue of Article 11, section 7 of the Pennsylvania Constitution. In reaching its decision the court stated as follows:

"[B]ut we think the limitation of infamous crimes in this State, within the meaning of the Constitutional provision under consideration, does not extend beyond treason, common-law felonies and all species of the crimen falsi, such as forgery, perjury, subornation of perjury and similar crimes, and does not include the offense of receiving stolen goods."

In *Commonwealth ex rel. Hazel v. Flannery,* 13 D.&C. 3d 58 (1979), the Constable of Trainer Borough in Delaware County was convicted of burglary, larceny and conspiracy on January 26, 1971, and sentenced to a term of four months to 23 months in the Montgomery County prison. The attempt to remove him from office was based on Article II, section 7 of the Pennsylvania Constitution and was brought four years into a six-year term. The court found that those offenses were not infamous offenses and in doing so stated as follows:

"This case comes before this court in 1979, not in the 1800s, the 1920s, 1930s, 1940s, 1950s or even the 1960s. It comes before the court at a time when our legislature no longer considers adultery and fornica-

tion a crime and at a time when the Commonwealth of Pennsylvania itself is in the lottery business; at a time when men, women and children are using language and doing things that were considered disgraceful, offensive, vile, etc. as little as 20 years ago. It was over 30 years ago that the use of word [damn] by Rhett Butler was somewhat shocking and would no doubt not have been permitted had it not been in the movie epic 'Gone With the Wind.' Today, words that can be considered much more offensive are used in everyday conversation, broadcast over the radio and heard on television and in moving picture theaters. Many things that were considered immoral as little as 20 years ago are not considered immoral in our modern society.

"This case must be decided under the law as it is today. . ."

Further, in the opinion the court used the following language:

"Defendant was convicted and sentenced, both of which received wide publicity in his borough, prior to his election in November 1973. However, the voters of the Borough of Trainer, even with the knowledge of his conviction, considered him a fit person to be elected to a third term as constable. The voters have in effect 'passed upon his credibility.' Any interpretation of Article II, section 7 that would void the will of the electorate should be avoided especially as to an action instituted after defendant has served four years and five months of a six-year term.

"The re-election to office operates as a condonation of the people of the Borough of Trainer of his illegal act: 43 Am. Jur. *Public Officers* §202 (1942). A court should not remove a public officer for an act committed prior to his present term in office as it

would deprive the people of their right to elect their officers: *Conant v. Grogan,* 6 N.Y. 322 (1887).

"Defendant paid his debt to society by serving his sentence. Without a very clear constitutional or statutory mandate to the contrary should the courts deprive him of his office? We think not."

The editor's note to this case indicates that an appeal was taken to the Superior Court but was withdrawn.

In *Commonwealth v. Rudman,* 94 Pitts. Leg. J. 217 (1946), a justice of the peace pled nolo contendere to the charge of misbehavior in office and extortion under color of office. The court based its decision on the fact that the conviction had come prior to the defendant's election to office, but citing the *Shaver* case stated that the offense involved would not seem to be an infamous offense.

In *Wilner's Petition,* 12 D.&C. 680 (1929), Frank P. Barnhart, Judge for the 47th Judicial District, was convicted on a nolo contendere plea of forgery. The question of whether forgery is an infamous offense arose but it was apparently agreed by counsel for Judge Barnhart that the crime of forgery and altering a written instrument is an infamous crime.

The most recent case and appellate authority on the issue is *In re Petition of Hughes,* 516 Pa. 90, 532 A.2d 298 (1987). Here Harry Jannotti, a Philadelphia City Councilman, was convicted of conspiracy to obstruct interstate commerce in violation of the Hobbs Act, 18 U.S.C. §1951(a). During the FBI's "Abscam" investigation of corruption in government, undercover men posed as agents of a fictitious Arab sheik, who, it was represented, was interested in constructing a multimillion dollar hotel in Philadelphia. The agents of the sheik would be willing to pay for favors of government officials which would facilitate the venture. Jannotti was contacted and

met with the agents of the sheik. At the meeting he assured the agents that there would be no obstacles imposed by the city government, or that if there were, they would be manageable. At the end of the meeting he received $10,000 cash.

Jannotti was sentenced to six months imprisonment and fined $2,000. He subsequently decided to run again for city councilman and filed a nominating petition, which was objected to by one Patricia A. Hughes on the basis that Jannotti had been convicted of an infamous crime and was, therefore, barred from holding public office by Article II, section 7 of the Pennsylvania Constitution. The lower court dismissed Hughes' petition and on appeal Commonwealth Court reversed, holding that the violation was for an infamous crime. In affirming the Commonwealth's Court decision, the Pennsylvania Supreme Court held as follows:

"Thus, although Jannotti was not convicted of bribery, he was convicted of a crime the essence of which was bribery, and bribery is encompassed in the phrase 'other infamous crime.' We hold, therefore, that the facts underlying Jannotti's conviction for conspiracy to violate the Hobbs Act compel the conclusion that his crime was 'infamous' within the meaning of Article II, section 7 of the Pennsylvania Constitution."

Finally, in the *Hughes* case, the Supreme Court quotes certain language from *State ex rel. Wier v. Peterson,* 369 A.2d 1076 (Del. Super. 1976). In that case the court in discussing what constitutes an infamous crime states as follows:

"It does not follow from that opinion, however, that every felony is necessarily a crime of infamy; on the contrary, the totality of the circumstances in each case must be examined before a determination may be made that a specific felony is infamous."

As can readily be observed, the relatively few cases pertinent to this subject do not offer clear guidance to a determination of what constitutes an infamous crime under the Pennsylvania Constitution. The *Hughes* case does to some extent define the class of infamous crimes by the following language:

"When they [elected public officials] depart from these norms, as Jannotti did, and commit criminal acts involving dishonesty in public office which affect the honest administration of government, they will not then be heard to say that their crimes are not 'infamous' within the meaning of Article II, section 7."

That these types of offenses do not make up the entire class is evidenced by the following language:

"The determination of how expansively we should define the class of 'infamous crime' is not necessary to this decision and is, I believe, an issue left open by the majority." (Hutchinson, *J.*, concurring.)

Whether a particular crime shall be deemed an infamous crime, so as to bar an individual from holding public office, is in our opinion a determination that should be based upon the totality of the circumstances of the case, keeping in mind the historical import of the term and the purpose of such a constitutional provision. In making the decision, the right of the voters to elect a candidate of their choice should be a limiting influence. While a constitutional provision such as Article II, section 7 is intended to require that all candidates for public office possess high moral qualities, it cannot be a provision used by the court to substitute its judgment for that of the voters.

In this case Cullen was convicted of a "white collar" crime all too prevalent in our society. It

involves dishonest conduct, made criminal by the Welfare Code, so as to provide some control over the payment of public funds to those providing medical services under the provisions of that act. The convictions were apparently not viewed to be of such gravity as to cause Cullen to lose his license to practice dentistry,* and he will, in three years, be eligible once again to provide Medicaid services. While we agree with counsel for the petitioners that those in the medical profession have historically been afforded a certain degree of public respect, which Cullen may have disregarded, this is not a case of "criminal acts involving dishonesty of public office which will affect the honest administration of government."

Regretfully no clear line of decision exists for our benefit, however, in reviewing the existing precedent it is our sense that this type of offense would not have historically been considered to be infamous. We recognize that the purpose of such constitutional provision is to provide us with office holders of integrity, and quite frankly are concerned by the dishonest nature of the conduct. However, at some point one convicted of a crime must not suffer the disqualifying effect of an infamous crime, and the decision of his fitness for office must rest with the electorate. Lastly, we note that Cullen has

---

* The General Dental Law at 63 P.S. §123.1(a)(1) provides as follows:

"(a) the board shall have authority, by majority action, to refuse, revoke and suspend the license of any dentist or dental hygienist for any or all of the following reasons:

"(2) making misleading, deceptive, untrue or fraudulent representations.

"(4) having been found guilty of a crime or misdemeanor involving moral turpitude or having been found guilty of a felony in violation of the laws of this Commonwealth or any other state, territory or country."

complied with the terms of the sentence imposed by the Dauphin County court.

After substantial consideration of this matter, it is our judgment that the circumstances of this case are not so compelling as to cause us to conclude that the crime committed was infamous, automatically precluding Cullen from holding public office. Without question, using the words of Justice Kennedy in the *Shaver* case, it is an offense of great public concern, and could undoubtedly influence the judgment of a segment of the electorate. However, whether he is precluded from holding public office should not in this case be the result of a strained interpretation of the term infamous crime, but rather should be a reflection of the will of the citizens of this county.

Wherefore we enter the following

## ORDER OF COURT

And now, March 26, 1991, after argument and due consideration the petition of the Bedford County Republican Party and of M. Jean Lohr is hereby denied.