ESSEX COUNTY COURT OF COMMON PLEAS.

IN THE MATTER OF THE APPLICATION OF ANGELO
MARINO FOR AN ORDER TO VOTE.

Decided May 7, 1945.

For the Superintendent of Elections, *Lester E. Mahr*.

For the applicant, *Michael A. Santa Maria*.

HARTSHORNE, C. P. J.   Applicant has been placed on the so-called "Order List" by the Superintendent of Elections of Essex County which thus prevents his voting (*R. S.* 19:32–16; *N. J. S. A.* 19:32–16) in the forthcoming Newark city election, May 8th, 1945.   This was on the ground that he was convicted of the crime of conspiracy, August 10th, 1942, in the United States District Court for the District of New Jersey, sitting at Newark.   He now applies to this court for an order permitting him to vote (*R. S.* 19:32–18; *N. J. S. A.* 19:32–18), contending that the above does not constitute just cause for placing him on the Order List.   The diligence of counsel has not revealed any previous decision in this state on this point involving the construction of the State Constitution.

The determinative question is the true meaning of the applicable provisions of the New Jersey Constitution (*N. J. S. A.*) and the statutory enactments thereunder which, so far as pertinent, are as follows:

"Article II, Right of Suffrage:

"Every * * * citizen of the United States, of the age of twenty-one years, who shall have been a resident of the State one year, and of the county in which he claims his vote five months, next before the election, shall be entitled to vote for all officers that are now, or hereafter may be elective by the people;   provided, that no person in the military, naval, or marine service of the United States shall be considered a resident in this State, by being stationed in any garrison, barrack, or military or naval place or station within this State;   and no pauper, idiot, insane person, or person convicted of a crime which now excludes him from being a witness unless pardoned or restored by law to the right of suffrage, shall enjoy the right of an elector; * * *."   Paragraph 1.

The statutory provision is as follows:

"Except as provided in sections 19:4–2 and 19:4–3 of this title, every person possessing the qualifications required by Article II, Paragraph 1, of the Constitution of the State of

New Jersey, as modified by the nineteenth amendment to the Constitution of the United States, and having none of the disqualifications mentioned in Article II, Paragraph 1, of the Constitution of the State of New Jersey, and being duly registered as required by this title, shall be entitled to vote in the polling place assigned to the election district in which he actually resides, and not elsewhere." (*R. S.* 19:4–1; *N. J. S. A.* 19:4–1.)

In the first place, it should be noted that it is the "Right of Suffrage" which is involved and, specifically, the qualifications and disqualifications of an "elector" or voter, as distinguished from provisions punishing for crime, which appear elsewhere in the Constitution (Articles I and VI).

In the next place, the very first line of the above constitutional provision shows that the people of the State of New Jersey, in adopting it, had in mind not alone New Jersey matters, but federal matters—the question of whether or not the would-be voter was qualified as a "citizen of the United States." This provision may well have been inserted both so as not to restrict the right of suffrage unduly to those born in New Jersey, as distinguished from those who have since moved here, and also because voters in New Jersey, so qualified, vote for federal offices as well as state and local offices by virtue of the provisions of the federal constitution (Article I, section 2). But regardless of the reason, it is important to note that this provision of our constitution refers, with reason, to the status of New Jersey citizens at federal law as a ground for their qualification or disqualification as voters.

We turn, then, to the other constitutional disqualifications above quoted. These include not merely a "person convicted of crime * * *" but also a "pauper, idiot, insane person." Clearly, the purpose of this one clause, setting forth all such disqualifications together, was not to invoke a punishment or a penalty—on an insane person, for instance—but was, in accordance with the then viewpoint of the State of New Jersey, to maintain the purity of our elections by excluding those would-be voters whose status was deemed to be inimical thereto. And such has been the construction applied to simi-

lar constitutional provisions in other states. "The manifest purpose of such restrictions is to preserve the purity of elections. The presumption is that one rendered infamous by conviction of felony or other offense indicative of moral turpitude is unfit to exercise the privilege of suffrage. The exclusion must, for this reason, be regarded as a mere disqualification imposed for protection and not for punishment, as the withholding of a privilege, and not the denial of a personal right." 18 *A. J., Elections,* 230, § 80; 29 *C. J. S., Elections,* 58, § 33.

Our own courts have clearly recognized the reality of this difference between imposing a punishment on an individual and protecting the public by preserving the proper character of its voters and of its holders of public office. *State* v. *Jefferson,* 90 *N. J. L.* 507, 509; 101 *Atl. Rep.* 569; *Walsh* v. *Trenton,* 117 *N. J. L.* 64, 70; 186 *Atl. Rep.* 818. That such was the intent of the New Jersey Constitution is made more clear by the fact above alluded to, that this constitutional provision appears under the "Right of Suffrage," not among the provisions covering punishment for crime.

But it is not every crime, a conviction of which disqualifies by the above constitutional clause. The pertinent disqualification provision is of "a person convicted of a crime which now excludes him from being a witness," subject to other conditions here immaterial. And this clause, by the use of the word "now," refers to the time of the adoption of the constitution on September 2d, 1844. At that time the ancient statute of June 7th, 1799 (*Pat. Laws* 401) was still in effect, which provided that no person convicted of blasphemy, treason, murder, piracy, arson; rape, sodomy, or any infamous crime against nature, bigamy, robbery, conspiracy, forgery, or larceny above the value of six dollars shall be admitted as a witness unless first pardoned; and no person convicted of perjury or subornation of perjury shall be admitted as a witness although pardoned. Since the constitution thus refers to this particular category of crimes and its intent was to maintain the purity of our elections, rather than to punish or penalize, it is evident that this act of 1799 was used as a convenient standard of reference of the kind of disqualifying crimes referred to in the constitution, without listing them

therein at length. In short, so far as here applicable, the pertinent constitutional provision, in substance, means that "no person convicted of the crime of conspiracy shall enjoy the right of an elector."

That this is the true meaning of this constitutional clause, and not that same refers only to a crime which, in fact, "excludes him from being a witness," is clear. For to-day, no crime, committed in New Jersey, for which a defendant is convicted in a court of the State of New Jersey, excludes the person convicted from being a witness. The Paterson Law of 1779 was repealed in 1874 by an act effective January 1st, 1875 (*Gen. Stat., p.* 3194, *pl.* 25, 29; *Id., p.* 3775, *pl.* 77). *State* v. *Henson,* 66 *N. J. L.* 601-604; 50 *Atl. Rep.* 468, 616. Thus, a construction that would make a disqualifying crime one which, in fact, excludes the one convicted from being a witness, nullifies that entire constitutional clause and renders its words mere surplusage, a construction which cannot be adopted if any other is reasonably open. Thus, such clause can only mean that a crime disqualifies which is *of the kind* which, at the time of the adoption of the constitution, excluded him from being a witness.

We come now to the crucial question, *i. e.,* whether such conviction for conspiracy means only a conviction in the New Jersey state courts and not a conviction of the same crime in the federal courts sitting in New Jersey. Three reasons at once suggest themselves why our citizens could not reasonably have intended to disqualify, as a voter, a fellow citizen convicted of conspiracy in the state courts and, at the same time, permit another citizen to vote who was convicted of the same crime in the federal courts in New Jersey. The first is that to do so would violate the major purpose of this very provision of the constitution of maintaining the purity of the ballot. Surely, one's character is equally tainted by a conviction of the crime of conspiracy under the same social conditions in the same state, whether rendered in a court sitting under the aegis of the federal, or of the state, authorities.

In the next place, even so far as regards the relatively minor effect upon the convicted person himself in his being prevented from voting, it would be clearly unjust to prevent the conspiracy convict in the state courts from voting and, at the

same time, to permit the conspiracy convict in the federal courts, living perchance next door, to cast his vote.

In the third place, the courts of this state have construed the same words in the very statute substituted for the ancient act of 1799, above quoted, in accord with this view. In 1874, at the very time the old act of 1799 was repealed as above, the legislature passed an act that "no person offered as a witness * * * shall be excluded by reason of his having been convicted of crime, but such conviction may be shown for the purpose of affecting his credit." (*Gen. Stat.* 1397, § 1.) The purpose of this change was clearly to change the previous effect of convictions of crimes, not the category of such convictions. These words, "convicted of crime," in such statute were specifically held to mean "any crime." *State* v. *Henson, supra.* These latter words, "convicted of crime," have remained in our law down through 1937 when the Revision incorporated the very words of the Henson decision by using the words "any crime." These words, "convicted · of crime," have consistently been held, from 1875 to date, by the courts of New Jersey, to cover convictions of crime in any jurisdiction, federal or state, domestic or foreign. *Brown* v. *State,* 62 *N. J. L.* 666, 694; 42 *Atl. Rep.* 811; *State* v. *Rombolo,* 89 *N. J. L.* 565, 568; 99 *Atl. Rep.* 434; *State* v. *Metalski,* 116 *N. J. L.* 543; 185 *Atl. Rep.* 351. Surely, the meaning of the very words used in a statute taking the place of the act of 1799, which the above constitutional clause uses as its standard of reference, should be applied to these same words as they appear in that constitutional clause itself. In addition, in the recent case of *Schireson* v. *State Board of Medical Examiners,* 130 *N. J. L.* 570; 33 *Atl. Rep.* (2d) 911, the situation involved the question whether a conviction in the federal courts, sitting in the State of Pennsylvania, constituted a conviction of "crime involving moral turpitude." While this point was not directly decided, it is evident from the opinion in the case that our highest court considered the applicant, there convicted in such federal court, to have been "convicted of crime."

In short, to hold that our citizens in fixing the standards of a would-be voter's character, which would disqualify him, intended to permit a man to vote when convicted of crime in

the federal court, but intended to deny this right to a man convicted of the same crime in the same city in a state court, would be "anomalous, illogical and unjust," as the state court of Indiana held in construing a similar provision of that state's constitution. *Crampton* v. *O'Mara,* 193 *Ind.* 551; 139 *N. E. Rep.* 360. Indeed, the only decisions there are in this country on this exact point, of the effect of a constitutional provision as to the conviction of crime as a disqualification for voting, all support the above view. *State* v. *Sartorius,* 351 *Mo.* 1237; 175 *S. W. Rep.* (*2d*) 787; *State* v. *Langer,* 65 *N. D.* 68; 256 *N. W. Rep.* 377; *State* v. *Vogel,* 65 *N. D.* 137; 256 *N. W. Rep.* 404.

Though involving somewhat differing situations, but yet the effectuation of an express public policy of the state involved, see, also, *Irby* v. *Day,* 182 *Ark.* 595; 32 *S. W. Rep.* (*2d*) 157; *State* v. *Irby,* 190 *Ark.* 786; 81 *S. W. Rep.* (*2d*) 419.

The only reason advanced for the opposite construction of the above constitutional clause is the contention that the inclusion of a federal conviction in New Jersey, as a basis for voting disqualification, would amount to the imposition by the federal government in this state of an additional punishment for a federal crime. It is readily admitted that one sovereign cannot impose punishment within the territory of another, and that that other cannot be compelled to impose punishment within its own territory on behalf of the first. *Commonwealth* v. *Green,* 17 *Mass.* 515; *Sims* v. *Sims,* 75 *N. Y.* 466; *Samuels* v. *Commonweath,* 110 *Va.* 901; 66 *S. E. Rep.* 222; *Kain* v. *Angle,* 111 *Va.* 415; 69 *S. E. Rep.* 355; *Weber* v. *State,* 18 *Okl. Cr.* 421; 195 *Pac. Rep.* 510; *Day* v. *Lusk,* 219 *S. W. Rep.* 597; *State* v. *Landrum,* 127 *Mo. App.* 653; 106 *S. W. Rep.* 1111; *Logan* v. *United States,* 144 *U. S.* 263, 303; 12 *S. Ct.* 617; 36 *L. Ed.* 429, 443; *State* v. *McDonald,* 164 *Miss.* 405; 145 *So. Rep.* 508; *State* v. *DuBose,* 88 *Tenn.* 753; 13 *S. W. Rep.* 1038; *Hildreth* v. *Heath,* 1 *Ill. App.* 82.

It will further be readily admitted that ordinarily a domestic sovereign will not lend its aid to the imposition of such punishment. But none of such ordinary situations are involved in this case.

In the first place, the inclusion of a federal conviction of a crime, expressly named by reference in the constitution, neither permits the federal authorities to impose, within the exclusive jurisdiction of the state, an additional punishment for the federal crime, nor does it compel the state to do so on behalf of the federal government. This can be seen if we consider whether, in the absence of the above New Jersey constitutional clause, any federal conviction could possibly disfranchise an otherwise qualified New Jersey voter. The answer is clearly no. It is, therefore, the New Jersey constitutional clause, expressing its own public policy as to the qualifications and disqualifications of its own voters, which, of its own force, as an expression of the will of the state sovereignty, not of the federal sovereignty, serves to disqualify the voter. This public policy makes the character of such voter, in fact, the criterion. In the same way that the constitution expressly makes federal status as a citizen of the essence, so it impliedly makes federal status as a criminal, which equally affects his character as a voter, of the essence. But it is the state constitution which alone can have this effect on the individual, and which alone makes the public policy of the people of the state a reality.

Again, while ordinarily a state will not effectuate the penal policy of another for the reason that usually it has no concern therewith, nevertheless, where the people of a state deem it to their advantage to aid in the effectuation of the penal policy of a sister state, and express themselves accordingly, they not only may do so, but have done so repeatedly. In fact, the State of New Jersey has largely been the originator throughout the United States of this very principle. This principle is the very basis of the four-point Interstate Crime Control program, which sprang from the first Interstate Conference on Crime, held in Trenton in 1935, and the earlier pathfinding of the National Conference of Commissioners on Uniform State Laws, and has now been adopted, in whole or in part, in more than three-fourths of the states of the Union. Under this program New Jersey, for instance, has expressed its public policy to aid its sister states in effectuating their penal laws, and for the very good reason that New Jersey thus obtains the aid of all its sister states in effectuating New

Jersey's own penal laws. The constitutionality of this program has been uniformly upheld by repeated decisions. As to the Uniform Act for the Rendition of Witnesses, see *In re Cooper*, 127 *N. J. L.* 312; 22 *Atl. Rep.* (2d) 532; as to the Uniform Extradiction Act, see *Culbertson* v. *Sweeney*, 70 *Ohio App.* 344; 44 *N. E. Rep.* (2d) 807; 140 *Ohio. St.* 426; 45 *N. E. Rep.* (2d) 118; *Cassis* v. *Fair* (*W. Va.*), 29 *S. E. Rep.* (2d) 245; as to the Inter-State Parole and Probation Compact, see *Ex parte Tenner*, 20 *Cal.* (2d) 670; 128 *Pac. Rep.* (2d) 338; *certiorari* denied, 314 *U. S.* 585; 62 *S. Ct.* 409; 317 *U. S.* 597; 63 *S. Ct.* 151. In addition, the United States Supreme Court has expressly laid down the rule that "a state court in conformity to state policy may, by comity, give a remedy which the full faith and credit clause does not compel." *Milwaukee County* v. *M. E. White Co.*, 296 *U. S.* 268; 56 *S. Ct.* 229, 231.

Thus, it is here the public policy of the State of New Jersey, as expressed in its fundamental law, which is to be effectuated. And the state is at liberty to adopt such standard as it desires in that regard, subject of course to the requirements of the federal constitution. It can therefore adopt a penal standard set by the federal government, particularly if same accords in fact with New Jersey's own standard expressed either in its fundamental law or its legislative acts as above.

For the reasons stated, the above cited decisions on extraterritoriality, relied on by applicant, are inapplicable to the present case. Furthermore, they do not even purport to cover the present case. For none of them, except by *dicta*, refer to the right of suffrage. They are all cases dealing simply with the exclusion of a witness or removal from office. Moreover, generally speaking, they are either based upon constitutional and statutory provisions dissimilar from those in New Jersey, or they rely in doctrine upon the case of *Commonwealth* **v.** *Green*, 17 *Mass.* 515, which is based upon no constitutional or statutory provisions whatever, but upon the general principles of the common law as to extraterritoriality as above alluded to. These general principles, as shown above, either do not apply at all, or, if they do, must give way to the intent of the people as expressed in their fundamental law, the con-

stitution. This principle is well evidenced by the two Missouri decisions of *State* v. *Landrum* (*Mo.*), 106 *S. W. Rep.* 1111, and *State* v. *Sartorious, supra.* In the earlier Landrum case the public policy of the state, as contained in its constitutional provisions as to the right of suffrage, was in nowise involved. The court therefore applied the state statute expressive of the common law rule as to extraterritoriality on exclusion of witnesses as above. On the other hand, in the Sartorius case, where the intent of the people to maintain the purity of its elections was involved, as expressed in its constitution, both the common law and Missouri statutory principles as to extraterritoriality were compelled to give way to the fundamental policy of the state constitution.

Obviously, decisions based upon a different constitutional and statutory intent are no more persuasive. In addition, the federal cases on which applicant relies of *Logan* v. *United States,* 144 *U. S.* 263; 12 *S. Ct.* 617, and *Brown* v. *United States,* 233 *Fed. Rep.* 353, have been overruled by the case of *Rosen* v. *United States,* 245 *U. S.* 467; 38 *S. Ct.* 148.

After all is said and done, the question here is one of constitutional and statutory construction, of effectuating the express intent of the people and their legislative representatives. The provisions in question of the New Jersey Constitution, both by reason of their title, their position and their terms, show that the intent of the people—the public policy of this state—is to safeguard the purity of our elections, and to consider the federal status and character of our citizens in that regard. In addition, the term "convicted of a crime" has consistently been construed in this state to include convictions in other than the New Jersey state courts. Hence, it would seem clear that the intent of the people of New Jersey, in adopting their constitution, was to maintain the purity of their elections by disqualifying, among others, those convicted of the crime of conspiracy, whether such conviction occurred in a New Jersey state court or in a federal court sitting in New Jersey. I am authorized to say that Judges Flannagan, Brennan and Naughright concur in this opinion.