**Robert A. STEPHENS, Plaintiff,**

v.

**William F. YEOMANS, as Superintendent of Elections in Essex County, New Jersey, Defendant.**

**Civ. A. No. 1005–70.**

United States District Court,
D. New Jersey.

Oct. 30, 1970.

Steven H. Gifis, Rutgers Law School, Roger Lowenstein, Law Department, Newark, N. J., for plaintiff.

George F. Kugler, Jr., Atty. Gen., Trenton, N. J., Dennis J. Quinn, Deputy Atty. Gen., of Counsel and on the Brief, for defendant.

## OPINION and ORDER

Before GIBBONS, Circuit Judge, and AUGELLI and WHIPPLE, District Judges.

GIBBONS, Circuit Judge.

The plaintiff, Robert A. Stephens, is a citizen and a permanent resident of Newark, Essex County, New Jersey. In 1961, when he was nineteen years old, he was convicted of larceny of an automobile in the County Court of Essex County. He received a sentence of probation for three years. Plaintiff is now employed as an electronics technician and in that capacity has received a security clearance from the federal government. He has not been convicted of a crime since 1961. On May 27, 1968, he registered as a voter with the Essex County Board of Elections. Thereafter he was notified that his name had been stricken from the voting list pursuant to N.J.S. 19:4–1(4) and 19:33–1. Plaintiff meets all qualifications for suffrage in Article 2 of the New Jersey Constitution except those of Article 2, par. 7, which provides:

> The Legislature may pass laws to deprive persons of the right of suffrage who shall be convicted of such crimes as it may designate. Any person so deprived, when pardoned or otherwise restored by law to the right of suffrage, shall again enjoy that right.

In 1948 acting apparently pursuant to paragraph 7 of Article 2, the New Jersey Legislature enacted N.J.S. 19:4–1 which provides:

> Except as provided in sections 19:4–2 and 19:4–3 of this Title, every person possessing the qualifications

required by Article II, paragraph 3, of the Constitution of the State of New Jersey and having none of the disqualifications hereinafter stated and being duly registered as required by this Title, shall have the right of suffrage and shall be entitled to vote in the polling place assigned to the election district in which he actually resides, and not elsewhere.

No person shall have the right of suffrage—

(1) Who is an idiot or is insane; or

(2) Who has been or shall be convicted of any of the following designated crimes, that is to say—blasphemy, treason, murder, piracy, arson, rape, sodomy, or the infamous crime against nature, committed with mankind or with beast, robbery, conspiracy, forgery, perjury or subornation of perjury, unless pardoned or restored by law to the right of suffrage; or

(3) Who was convicted prior to October 6, 1948, of the crime of polygamy or of larceny of above the value of $6.00; or who was convicted after October 5, 1948, and prior to the effective date of this act, of larceny of above the value of $20.00; or

(4) Who shall hereafter be convicted of the crime of larceny of the value of $200.00 or more, unless pardoned or restored by law to the right of suffrage; or

(5) Who was convicted after October 5, 1948, or shall be convicted of the crime of bigamy or of burglary or of any offense described in chapter 94 of Title 2A or section 2A:102–1 or section 2A:102–4 of the New Jersey Statutes or described in sections 24:18–4 and 24:18–47 of the Revised Statutes, unless pardoned or restored by law to the right of suffrage; or

(6) Who has been convicted of a violation of any of the provisions of this Title, for which criminal penalties were imposed, if such person was deprived of such right as part of the

punishment therefor according to law unless pardoned or restored by law to the right of suffrage; or

(7) Who shall be convicted of the violation of any of the provisions of this Title, for which criminal penalties are imposed, if such person shall be deprived of such right as part of the punishment therefor according to law, unless pardoned or restored by law to the right of suffrage.

A person who will have on the day of the next general election the qualifications to entitle him to vote shall have the right to be registered for and vote at such general election and register for and vote at any election, intervening between such date of registration and such general election, if he shall be a citizen of the United States at the age of 21 years and shall have been a resident of the State for at least 6 months and of the county at least 40 days, when such intervening election is held, as though such qualifications were met before registration. As amended L.1948, c. 438, p. 1695, § 3; L.1955, c. 156, p. 650, § 1; L.1957, c. 205, p. 724, § 1; L.1959, c. 127, p. 560, § 1; L.1964, c. 7, § 1.

More particular reference will be made to the somewhat peculiar ancestry of this enactment hereinafter.

Desiring to vote in the November 3, 1970, general election for federal and state candidates, plaintiff brought this action, requesting a three-judge district court pursuant to 28 U.S.C. §§ 2281 and 2284 (1964), and seeking an injunction restraining the defendant, William F. Yeomans, Superintendent of Elections, from enforcing N.J.S. 19:4–1(4) on the ground that plaintiff's disenfranchisement under that statute deprived him of the equal protection of the laws guaranteed to him by the fourteenth amendment. We have jurisdiction by virtue of 42 U.S.C. § 1983 (1964) and 28 U.S.C. § 1343 (1964).

Appearing for the defendant the Attorney General of New Jersey filed an answer which admitted the essential factual allegations, but asserted as an affirmative defense, in the answer and in affidavit form, that plaintiff had failed to apply to the Governor of New Jersey for restoration of the franchise by executive clemency, as provided in N.J.S. 2A:167–5 and in Regulation 11:72–30 of the New Jersey State Parole Board. The affidavit also set forth statistical information with respect to the action of the Governor on such petitions for executive clemency in the fiscal year ending June 30, 1970. At the final hearing the parties stipulated that the facts set forth in the affidavit were true, and also stipulated that in Essex County the annual number of persons stricken from the election rolls for disqualification under N.J.S. 19:4–1 was as follows: in 1970, 105; in 1969, 142; in 1968, 68; in 1967, 67; and in 1966, 87. The case is on this record ripe for final adjudication.

The defendant argues that we should abstain from deciding the constitutionality of this state statute, first, because there has been no final state interpretation of its application, and second, because plaintiff has failed to exhaust his administrative remedies. We decline to abstain. In the first place the interpretation of the statute by the Essex County Superintendent of Elections seems consistent with such prior New Jersey decisions as bear upon the matter. Application of Smith, 8 N.J.Super. 573, 73 A.2d 761 (L.Div.1950); Application of Marino, 23 N.J.Misc. 159, 42 A. 2d 469 (Com.Pl.1945). He is the state administrative officer charged with enforcement, and there is no indication that resort to the state courts of New Jersey would be likely to result in an interpretation different from his. Indeed the defendant does not here contend that the statute was misapplied to plaintiff. Moreover, it is unlikely, supposing plaintiff could still seek judicial review of the defendant's action, that the matter could be finally determined by the highest state court in New Jersey in time for the November 3, 1970, election. Nor do we find merit in the exhaustion of

administrative remedies argument. The New Jersey statutes providing for executive clemency, N.J.S. 2A:167–1, to 12, do not provide administrative review of the action of the Superintendent of Elections. Rather they impose as a precondition to eligibility for registration as a voter, for a limited number of otherwise eligible citizens, the obtaining of a discretionary equivalent of a pardon from the Governor. Plaintiff complains just as vigorously about being subjected to this precondition to eligibility as about his disenfranchisement. Abstention is at best a discretionary doctrine. See Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 328–329, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964); Louisiana Power & Light Co. v. Thibodaux, 360 U.S. 25, 30, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959). We see no reason for abstaining in this case, on the eve of the next general election, when its application will have the inevitable effect of continuing plaintiff's disenfranchisement past November 3, 1970. See Harman v. Forssenius, *supra,* 380 U.S. at 537, 85 S.Ct. 1177, 14 L.Ed.2d 50.

■ Finally, the defendant argues that the three-judge court should be dissolved and the case dismissed by a single district judge because the federal question is insubstantial. Principal reliance is on Green v. Board of Elections of City of New York, 380 F.2d 445 (2 Cir. 1967) and on Beacham v. Braterman, 300 F.Supp. 182 (S.D.Fla.1969), aff'd mem., 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969). In *Green* the Second Circuit affirmed the district court's refusal to convene a three-judge court to consider the constitutionality of a New York statute disenfranchising persons convicted of a felony. In *Beacham* a three-judge court in Florida upheld a Florida statute disenfranchising felons, and the Supreme Court granted the defendant's motion to affirm without opinion. Our examination of these two cases, the statutes with which they dealt,

and the New Jersey statute here in issue convince us that they are not dispositive. The federal constitutional question here presented is hardly insubstantial.

■ In his dissenting opinion in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), Justice Harlan outlined the analytical and historical argument that the equal protection clause of the fourteenth amendment was not intended to apply to state voting qualification laws. He pointed to the express language in section 2 of the fourteenth amendment, as well as to interpretations contemporaneous with the adoption of that amendment. The defendant also relies on section 2 of the fourteenth amendment. But Justice Harlan's view has not prevailed, and it is now established that a state voter classification disenfranchising resident citizens must pass equal protection muster under the equal protection clause of the fourteenth amendment.

Indeed it would seem to have been made clear as early as Justice Holmes' opinion in Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927), and to have been reiterated in Justice Cardozo's opinion in Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932), that section 1 of the fourteenth amendment applied to state classifications of voter qualifications. These were, of course, cases involving disqualification on account of race. But if, as the defendant contends, section 2 was intended as a limitation on the reach of section 1, then the only penalty for such racial disqualification should have been the loss of representation in the House of Representatives provided for in section 2. The Supreme Court, however, approved damage actions against the Texas election commissioners for their violation of section 1 of the fourteenth amendment.

In Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), the court held unconstitutional a Texas statute disenfranchising members of the

armed forces resident in that state. It said:

> It is true that the State has treated all members of the military with an equal hand. And mere classification, as this Court has often said, does not of itself deprive a group of equal protection. Williamson v. Lee Optical Co., 348 U.S. 483 [75 S.Ct. 461, 99 L. Ed. 563]. But the fact that a State is dealing with a distinct class and treats the members of that class equally does not end the judicial inquiry. "The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose * * *." McLaughlin v. Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222.

Carrington v. Rash, *supra* at 92, 85 S.Ct. at 778.

Voter classifications were again before the Supreme Court in Harper v. Virginia Board of Elections, 383 U.S. 663, 670, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169 (1966), in which payment of the Virginia poll tax as a qualification for voting was held unconstitutional. The court said:

> We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined. (citations omitted)
>
> These principles apply here. For to repeat, wealth or fee paying has, in our view, no relation to voting qualifications * * *.

Clearly the Supreme Court has evidenced a tendency in franchise disqualification cases toward a stricter than usual scrutiny of the States' chosen classifications. Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) is an indication of the trend. Holding unconstitu-

tional a New York statute which permitted only parents and property owners to vote in school board elections, the Court indicated that while some disenfranchising classifications might be valid:

> * * * the classifications must be tailored so that the exclusion of appellant and members of his class is necessary to achieve the articulated state goal. Section 2012 does not meet the exacting standard of precision we require of statutes which selectively distribute the franchise.

Kramer v. Union Free School District, *supra* at 632, 89 S.Ct. at 1892.

The "exacting standard of precision" language appears also in Cipriano v. City of Houma, 395 U.S. 701, 706, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1968), which held unconstitutional a Louisiana statute limiting the franchise in revenue bond referendums to "property taxpayers". Most recently, in Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970), the Court, in holding unconstitutional a Maryland statute excluding from the franchise residents of federal enclaves, reiterated that while disenfranchising classifications may be permissible, they are, under the fourteenth amendment, decidedly suspect. They may only be justified if they bear a rational relationship to the achievement of a discernable and permissible state goal.

The defendant argues that there appears in section 2 of the fourteenth amendment the language "except for participation in rebellion, *or other crime*", and that this language is an express recognition of the right of the states to disenfranchise convicted criminals. The quoted language does not advance the defendant's position however. It is an express exception or proviso in section 2, which in its general terms imposes a penalty on those states which disenfranchised for reasons other than rebellion or crime.[1] Since it is now

---

1. Section 2. Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any elec-

clear that the entire section 2 imposes no limitation on section 1, it can hardly be argued that the exception or proviso in section 2 was intended to impose such a limitation. We conclude, therefore, that the New Jersey statute which disenfranchises plaintiff must be judged by the exacting equal protection standards laid down by the Supreme Court in the voter disqualification cases referred to hereinabove. The disqualification must bear a rational relationship to the achievement of a discernable and permissible state goal. To the extent that Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1889), and Murphy v. Ramsey, 114 U.S. 15, 5 S.Ct. 747, 29 L. Ed. 47 (1885), indicate otherwise they must be considered as limited by the subsequent voting right cases discussed hereinabove.

Disenfranchisement of felons in New Jersey has had a curious history. The Constitution of 1776 provided for no such disqualification. Article IV permitted all inhabitants of the colony of full age, who were worth fifty pounds, to vote. N.J.Const. Art. IV (1776). Articles XXI and XXII adopted prior laws and the common and statute law of England except to the extent repugnant with the 1776 Constitution. Whether these sections were intended to carry forward the common law status of infamy for conviction of felonies is at least open to question, since Article XVI provided:

> That all criminals shall be admitted to the same privileges of witnesses and counsel as their prosecutors are or shall be entitled to.

N.J.Const. Art. XVI (1776).
In any event, in 1799 an Act Concerning Witnesses was passed. L.1799, c. DCCC III, p. 547. See Pennington's Revision (1821), p. 462; 1846 Revision, Title 34, c. 9, p. 957. This statute provided:

> That no person who shall be convicted of blasphemy, treason, murder, piracy, arson, rape, sodomy, or the infamous crime against nature, committed with mankind or with beasts, polygamy, robbery, conspiracy, forgery, or larceny above the value of six dollars shall in any case be admitted as a witness unless he or she be first pardoned; and no person who shall be convicted of perjury, although pardoned for the same, shall be admitted as a witness in any case.

It is not clear to us whether this was a restoration of the testimonial incompetency attaching to the status of infamy, previously abandoned, or a codified narrowing of that status as it existed at common law. In any event, as of 1799 resident convicted felons who had fifty pounds could still vote even though some of them could not testify.

So things continued until 1844. That year New Jersey adopted a new constitution, which restricted suffrage to white male citizens of the age of twenty-one. Suffrage was denied to paupers, idiots, insane persons, or persons "* * * convicted of a crime which now excludes him from being a witness unless pardoned or restored by law * * *." N.J.Const. Art. II, § 1 (1844). The 1844 Constitution also authorized the Legislature to pass laws depriving persons of suffrage who are convicted of bribery at elections. Later the 1844 Constitution was amended to eliminate the white qualification, and to delete the "at elections" limitation on the bribery ground for permitted legislative disqualification, N.J.Const. Art. II, § 1 (Amended 1875). Thus in 1844 disqualification of some infamous felons

---

tion for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

first became law in New Jersey by a constitutional cross-reference to the 1799 Act Concerning Witnesses, *supra.*

So things continued until 1874. In that year the Legislature, somewhat belatedly yielding to Bentham's arguments,[2] repealed the disqualification of felons as witnesses. An Act Concerning Evidence, 1874 N.J.Rev.Stat., p. 267; 2 Gen.St. p. 1397, § 1 (1874). See State v. Henson, 66 N.J.L. 601, 50 A. 468, 616 (E. & A.1901). But although infamous felons became qualified as witnesses, the provision in the 1844 constitution respecting voter qualifications remained unchanged until 1948. The New Jersey courts interpreted that provision as continuing to disenfranchise those who under the 1799 statute would have been disqualified as witnesses. Application of Marino, *supra,* The election statutes merely referred to the 1844 Constitution. See, e. g., An Act to Regulate Elections (Revision 1930) (L.1930, C. 187, p. 671).

Up until 1898 New Jersey still had common law felonies. In that year common law felonies were eliminated and became statutory offenses; our so called high misdemeanors. The disenfranchisement thereafter depended upon a determination that the conviction was of a New Jersey statutory offense, or a federal offense, or an out of state offense, which could be analogized to the common law felonies listed in the 1799 statute. See Application of Marino, *supra.*

This was the situation when in 1947 New Jersey adopted its present constitution. It included a new article on suffrage which eliminated the old reference to testimonial disqualification and substituted Article 2, par. 7, quoted hereinabove. Acting pursuant to that provision the New Jersey Legislature re-enacted, virtually unchanged, the 1799 statute. N.J.S. 19:4–1 (2)–(5). It raised, prospectively, the six dollar amount for a larceny disqualification to twenty dollars. In 1955 burglary and some statutory drug offenses were added to the list, and in 1957 the larceny amount was raised prospectively, to two hundred dollars, its present limit. This is the legislative classification of which plaintiff complains.

The haphazard development outlined above has produced some remarkable contrasts in treatment. Most defrauders, including persons convicted of income tax fraud, remain eligible to vote. A public official convicted of extortion under state or federal law remains eligible. Embezzlers are eligible but those convicted of larceny are ineligible. Conviction of bribery of a judge or legislator, state or federal, is not disenfranchising. Conviction of an unsuccessful attempt at murder is not disenfranchising, although a conviction for murder is. Kidnapping, abduction, abortion, carnal abuse, loan sharking, mayhem, prostitution, draft evasion, possession or carrying of bombs, and inciting to insurrection are additional examples of non-disenfranchising convictions. Thieves are disenfranchised. Receivers of stolen property are not. It is hard to understand why Bill Sikes should be ineligible for the franchise and Fagan eligible.

■ Location of the constitutional authority for the statute in the article on suffrage, and of the statute in the title on elections, suggests that the intended state purpose for the disenfranchisement has something to do with the purity of the electoral process. The courts of New Jersey have assumed as much. Application of Marino, *supra.* How the purity of the electoral process is enhanced by the totally irrational and inconsistent classification set forth in N.J.S. 19:4–1 (2)–(5) is nowhere explained. We perceive no rational basis for the New Jersey classification. Certainly it cannot meet the exacting standard of precision required by the equal protection clause for a selective distribution of the franchise. We hold the classification set forth in N.J.S. 19:4–1 (2) through (5) to be invalid under that clause.

2. J. Bentham, Rationale of Judicial Evidence, b. IX, pt. III, c. III (1827) (VII Bowring's ed., pp. 406 ff.) See II Wigmore on Evidence 610 (3rd ed. 1940).

This opinion shall be our findings of fact and conclusions of law. The defendant Superintendent of Elections is ordered to restore plaintiff's name to the voter list for Essex County in time to permit plaintiff to vote at the November 3, 1970, general elections, all without costs.