532 A.2d 298

**In re Petition of Patricia A. HUGHES.**

**In re Petition of Harry P. JANNOTTI.**

Supreme Court of Pennsylvania.

Argued May 15, 1987.

Decided Oct. 15, 1987.

Mark Jurikson, Philadelphia, for petitioner.
John W. Morris, Philadelphia, for respondent.

Before NIX, C.J., and LARSEN, FLAHERTY,
McDERMOTT, HUTCHINSON, ZAPPALA and
PAPADAKOS, JJ.

### OPINION OF THE COURT

FLAHERTY, Justice.

The fundamental question raised by this case is whether Article II, Section 7 of the Pennsylvania Constitution, which prohibits those who have been convicted of "infamous crimes" from holding public office in Pennsylvania, should be applied to bar the election of a candidate for public office who was convicted in federal court of conspiracy to obstruct interstate commerce in violation of the Hobbs Act, 18 U.S.C. § 1951(a). For the reasons that follow, we hold that it does.

Harry Jannotti was a member of Philadelphia City Council during 1980, when the FBI was pursuing its "ABSCAM" investigation of corruption in government. The investigation was carried out by undercover FBI men posing as agents of a fictitious Arab sheik who was interested supposedly in immigrating to the United States and building a multi-million dollar hotel in Philadelphia. In order to facilitate these interests, the agents of the sheik were willing to pay money in exchange for the votes and/or friendly intercession of government officials on the sheik's behalf.

One Weinberg, described as a "career swindler," was employed by the FBI to "spread the word" of the sheik's interests and his willingness to pay for help in advancing those interests. As part of the Philadelphia phase of AB-SCAM, Weinberg called one Criden, a Philadelphia lawyer, and hired him to arrange meetings between the sheik's representatives and government officials willing to receive money in exchange for influence.[1] Among the meetings which Criden arranged for the undercover agents was one with Harry Jannotti, an influential member of Philadelphia's City Council. Before Jannotti actually met with the

1. Criden himself was later prosecuted for his role in procuring corrupt officials.

undercover FBI agents, Criden told him of the hotel project and of the sheik's intention to pay him $10,000 in cash.

After his meeting with Criden, Jannotti went to the Barclay Hotel to meet with the sheik's representatives, assured them of his good will toward the hotel project, and received $10,000 in cash at the end of the meeting. Jannotti told the sheik's agents that he would vote for the project and, as the Third Circuit Court of Appeals summarized it, he "gave assurances that there would be no [municipality imposed] obstacles or that the obstacles, if any, would be manageable." *United States v. Jannotti*, 673 F.2d 578, 596 (3rd Cir.1982).

On the basis of these facts, Jannotti was found guilty of conspiring to obstruct interstate commerce under the Hobbs Act, 18 U.S.C. § 1951(a), by a jury sitting in the United States District Court for the Eastern District of Pennsylvania.[2] Jannotti was charged with the substantive violation of the Hobbs Act as well as conspiracy to violate the act, but he was convicted only on the conspiracy count because a substantive conviction (*actually* interfering with interstate commerce) requires that the defendant's act actually affect interstate commerce, which, in this case, was impossible, since the sheik and his hotel project were fictions.

After entry of the verdict, the trial court granted Jannotti's motions to set aside the verdict of the jury in its entirety for lack of jurisdiction and granted his motion for judgment of acquittal. The Third Circuit Court of Appeals, sitting, *en banc*, reversed, thus reinstating the original jury verdict, and a panel of the Third Circuit Court of Appeals subsequently affirmed the reinstated conviction on appeal. The panel stated:

**2.** The Hobbs Act provides, in pertinent part:
> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do ... shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).

. We find that the government's evidence established overwhelmingly that the defendants enthusiastically accepted bribes. There simply is no credible evidence that the defendants were reluctant to take the money. To the contrary, the evidence shows the defendants, each of them an elected public official, boasting of their power and their corruption.[3]

*United States v. Jannotti,* 729 F.2d 213, 225 (3rd Cir.1984).

Jannotti was sentenced to six months imprisonment and fined $2,000. However, in 1987, he decided to run again for public office and filed a petition for nomination for city councilman. Thereafter Patricia A. Hughes filed a petition in the Court of Common Pleas of Philadelphia objecting to the Jannotti nomination on the grounds that Jannotti had been convicted of an "infamous crime" and that under the Pennsylvania Constitution he was barred from holding public office. The Common Pleas Court held that Jannotti's conviction was not for an "infamous crime," dismissed the Hughes petition with prejudice, and ordered that Jannotti's name be placed on the primary ballot. On appeal, Commonwealth Court reversed and held that Jannotti's conviction was for a crime "involving the receipt of payments relating to his performance of the duties and powers of his public office," and thus, that the conviction was for a crime which was tantamount to bribery, which has been defined as "infamous."

On May 12, 1987 this Court stayed the Order of Commonwealth Court and directed the parties to address the question of whether an allowance of appeal should be granted and the question of the merits of the case. Argument was heard on May 15, 1987, and on May 18, 1987 we entered an Order affirming the order of Commonwealth Court, 516 Pa. 90, 532 A.2d 298. This Opinion is filed in support of the Order of May 18.

**3.** The court's reference is to "defendants" in the plural because Jannotti was tried with one George Schwartz, then president of Philadelphia City Council, who also accepted bribes in exchange for promised future intercession on behalf of the sheik.

 The Pennsylvania Constitution, Article II, Section 7, provides:

No person hereafter convicted of embezzlement of public moneys, bribery, perjury or other infamous crime, shall be eligible to the General Assembly, or capable of holding any office of trust or profit in this Commonwealth.

The question, thus, is whether Jannotti's conviction falls within the prohibition of Article II, Section 7.

The two significant challenges which Jannotti poses to the determination that his federal conviction bars him from holding public office in Pennsylvania are that the crime he was convicted of was not "infamous"; and secondly, that although the facts of the federal case against him included evidence that he took a bribe, he was not *convicted* of bribery, and therefore, he may not be barred from office on the basis of a bribery conviction.

As the United States District Court observed, the evidence that Jannotti received a payment of money was undisputed.[4] Additionally, the only evidence in the federal case that would support a conviction of conspiracy to obstruct interstate commerce under the Hobbs Act concerned Jannotti's receipt of this money in exchange for official favors. The federal jury, therefore must have concluded that Jannotti received the money in exchange for supporting the sheik's business interests. Had they not found this, there would have been no factual basis for the conspiracy conviction.

Although Jannotti is correct in asserting that he may not be barred from office on the grounds that he was convicted of bribery, (since he was convicted of a violation of the Hobbs Act, not bribery), the facts underlying his conviction are relevant, nonetheless, in considering whether his convic-

---

4. The District Court stated:
 There is no dispute about the defendants' receipt of the payments, and the evidence permitted, although it did not compel, the inference that the payments represented bribes paid in exchange for the defendants' assurances of using their official positions to pave the way for expeditious completion of the project.
*United States v. Jannotti,* 501 F.Supp. 1182, 1184 (E.D.Pa.1980).

96

tion was for an "infamous" crime within the meaning of Article II, Section 7. This is so because although the term "infamous crime" is not self-defining, when the language of Article II, Section 7 enumerates the crimes of bribery, embezzlement of public moneys, and perjury, followed by the words "or *other* infamous crime," the necessary implication is that the three enumerated crimes are "infamous." Therefore, if the facts underlying Jannotti's conviction would support a conviction for bribery under Pennsylvania law, then Jannotti's federal conviction, however it may be named in federal law, would be for an "infamous" crime.

The Pennsylvania Crimes Code defines "Bribery in official and political matters" as follows:

(a) Offenses defined.—A person is guilty of bribery ... if he ... solicits, accepts or agrees to accept from another:

(1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter by the recipient;

(2) any benefit as consideration for the decision, vote, recommendation or other exercise of official discretion by the recipient in a judicial, administrative or legislative proceeding; or

(3) any benefit as consideration for a violation of a known legal duty as a public servant or party official.

18 Pa.C.S. § 4701(a). The facts underlying Jannotti's federal conviction would constitute a violation of 18 Pa.C.S. § 4701(a)(1) in that Jannotti accepted a pecuniary benefit as consideration for his vote and exercise of discretion as a public servant.

Thus, although Jannotti was not convicted of bribery, he was convicted of a crime the essence of which was bribery, and bribery is encompassed in the phrase "other infamous crime." We hold, therefore, that the facts underlying Jannotti's conviction for conspiracy to violate the Hobbs Act compel the conclusion that his crime was "infamous" within the meaning of Article II, Section 7 of the Pennsylvania Constitution.

Jannotti argues that although there have been few decisions of this Court defining "infamous crimes," what caselaw there is would require the conclusion that his conviction was not for an infamous crime, either because the relevant constitutional provision and its terms must be strictly construed, *Commonwealth v. Reading*, 336 Pa. 165, 6 A.2d 776 (1939), or because Jannotti's crime was not one of "falsehood" which affected the administration of justice, *Commonwealth v. Shaver*, 3 W & S 338 (1842), *Schuylkill v Copley*, 67 Pa. 386 (1871). As to the latter claim, suffice it to say that Jannotti's crime *is* in the nature of a falsehood which *does* affect the administration of justice. To hold otherwise would be to suggest that justice is not affected when a councilman sells his vote.

As to the strict construction of the terms of the constitutional provision, we are guided by *In re S.M. Greenberg*, 442 Pa. 411, 280 A.2d 370 (1971), which involved a common pleas judge who was convicted of conspiracy to use the United States mail to perpetrate a fraud, i.e., "kiting" bank checks over a four year period prior to his service on the bench. In that case, we were called upon to construe the meaning of "infamous crime" in the context of another constitutional provision Article V, Section 18, concerning the removal of public officers "on conviction of misbehavior in office or of any infamous crime." We stated:

This Court held long ago that an infamous crime is one which rendered the convicted person incapable of being a witness or juror. "The offenses which disqualify a person to give evidence, when convicted of the same, are treason, felony, and every species of crimen falsi ... which involve the charge of falsehood, and affect the public administration of justice." *Commonwealth v. Shaver*, 3 W. & S. 338, 342 (1842). Without suggesting that this definition is sufficiently inclusive for the modern era, we have no hesitation in holding that the federal crime of using the mails to defraud is clearly within the ambit of the *Shaver* classification.

*In re S.M. Greenberg*, 442 Pa. at 417, 280 A.2d at 372–73. Similarly, in this case, we have no difficulty in concluding that the federal crime of conspiring to take money in exchange for official favors is within the ambit of *Shaver*. In fact, the present case is even more compelling than *Greenberg*, for here the crime was committed while Jannotti was in office and it was related to his official duties.

There is something incongruous, in light of the facts which led to Jannotti's conviction, in his petitioning this Court to declare that he is constitutionally fit to hold public office. The purpose of a constitutional restriction disallowing one who has abused the public trust from holding public office is well explained by the Supreme Court of our sister state Delaware, which has a constitutional provision similar to our own. Delaware's constitution provides:

> No person who shall be convicted of embezzlement of the public money, bribery, perjury, or other infamous crime, shall be eligible to a seat in either House of the General Assembly, or capable of holding any office of trust, honor or profit under this State.

Delaware Constitution, Article II, Section 21. In explaining the significance of this section, the Supreme Court of Delaware said:

> To fully understand the operation of Art. II, § 21, it is necessary to examine its purpose. In our view, it is essentially a character provision, mandating that all candidates for State office possess high moral qualities. It is not a provision designed to punish an offender. While conviction of an infamous crime does not imply that an offender is incapable of functioning as a respected and productive member of society, it is irreversible evidence that the offender does not possess the requisite character for public office. It is important to emphasize that we are not concerned here with the standard of compassion which should govern daily interpersonal relationships. We deal, rather with a norm established by our Constitution for those who seek to govern us. Without question, it is a demanding norm.

*State ex rel. Wier v. Peterson,* 369 A.2d 1076, 1080–81 (Del.1976).

We fully agree with the assessment of the Supreme Court of Delaware that "those who seek to govern us" should be subject to a demanding constitutional norm. Elected public officials are entrusted with the public welfare and are duty-bound to treat that trust with the highest standards of care, honesty, and informed independence of judgment. They are charged to act in the interest of the public only, not themselves, and they are obligated to maintain the reality and the appearance of personal disinterestedness in matters affecting their public duties. When they depart from these norms, as Jannotti did, and commit criminal acts involving dishonesty in public office which affect the honest administration of government, they will not then be heard to say that their crimes are not "infamous" within the meaning of Article II, Section 7.

█ Affirmed.[5]

NIX, C.J., and LARSEN, McDERMOTT, HUTCHINSON and ZAPPALA, JJ., join. In addition, HUTCHINSON, J., files a concurring opinion in which NIX, C.J., and LARSEN, McDERMOTT and ZAPPALA, JJ., join.

PAPADAKOS files a concurring opinion.

HUTCHINSON, Justice concurring.

I join the majority opinion. Properly interpreted, I believe it does not limit the provision of the Pennsylvania

---

**5.** Jannotti raises at least four additional questions, three of which we decline to address because they are not clearly argued. The fourth, whether a court may make an *a priori* determination of a candidate's constitutional qualifications for office, must be answered in the affirmative on the facts of this case. Jannotti's argument to the contrary relies on *In re Jones,* 505 Pa. 50, 476 A.2d 1287 (1984), a plurality opinion of this Court which has no precedential value and which concerns an election to the Senate of the General Assembly, not an election to a city council. *Jones,* thus, established no controlling precedent, and even if it had, it would not apply to the facts of this case.

Constitution disqualifying from office persons convicted of crimes to crimes analogous to those which would have been grounds for disqualification at common law, such as bribery, or conduct which is criminal under Pennsylvania law. The determination of how expansively we should define the class of "infamous" crime is not necessary to this decision and is, I believe, an issue left open by the majority.

NIX, C.J., and LARSEN, McDERMOTT and ZAPPALA, JJ., join in this concurring opinion.

PAPADAKOS, Justice, concurring.

While I agree with the proposed disposition of this case, I write separately to express my concern over the lack of the majority to define easily and with specificity the term "infamous crimes" as applied in Article II, Section 7 of the Pennsylvania Constitution. There are other special considerations which I believe must be encompassed by our jurisprudence on this subject. With great regret I foresee a continuation of criminal conduct by public officials which implicates the public trust and public confidence. I believe it is essential that we state plainly and without equivocation the nature of "infamous crimes" whose commission by public officials will permanently deprive them of public office.

I would hold that a conviction rendered anywhere in the United States based upon any criminal conduct which involves the violation of a public trust by a public officer constitutes an "infamous crime" for purposes of Article II, Section 7 of the Pennsylvania Constitution.

I reach this conclusion based on the Constitution, however, by analyzing the forms of infamy at common law and their relevance to today's public conception of a public trust. The most recent form defines an infamous crime in terms of punishment. Under federal and certain state laws, the determinant factor is the punishment which *may* be imposed. Federal cases, in fact, have held that an infamous crime is one in which the punishment is for hard labor, *United States v. Moreland,* 258 U.S. 433, 42 S.Ct. 368, 66

L.Ed. 700 (1922), or imprisonment in a penitentiary as opposed to a county jail, *Mackin v. United States*, 117 U.S. 348, 6 S.Ct. 777, 29 L.Ed. 909 (1886), or imprisonment for more than one year. *See also, United States v. Shober*, 489 F.Supp. 393, 400 (E.D.Pa.1979); and *Drazen v. New Haven Taxicab*, 95 Conn. 500, 111 A. 861 (1920). Generally speaking, this interpretation is the modern view.

A more ancient type of infamy, however, is defined by the nature of the crime. In this category are found the offenses of treason and dishonesty which traditionally have been included in the term "crimen falsi." [1] *Re Application of Westenberg*, 167 Cal. 309, 139 P. 674 (1914); *Kurtz v. Farrington*, 104 Conn. 257, 132 A. 540 (1926). Under this view, it is the nature of the offense rather than the severity of the punishment which determines whether the conviction results in a legal infamy. Our own explicit constitutional designation of "embezzlement of public monies, bribery, perjury or other infamous crimes" is intended to fit such a monistic scheme resting on the twin concepts of trust and decency. In *Commonwealth v. Jones*, 334 Pa. 321, 323, 5 A.2d 804, 805 (1939), we held that: "The term [crimen falsi] involves the element of falsehood, and includes everything which has a tendency to injuriously affect the administration of justice by the introduction of falsehood and fraud.... It has been held to include, also, forgery, perjury, subornation of perjury, suppression of testimony by

1. Under Greco-Roman Law, the term "crimen falsi" embraces such crimes as perjury, subornation of perjury, barratry, conspiracy, swindling, cheating, and other similar acts. Roman law, defined infamy by the nature of the act. Definition by punishment entered Anglo-American jurisprudence at the time when the concept of felony was developed, and both Sir Matthew Hale, Chief Justice of the Court of King's Bench and Sir William Blackstone of Common Pleas embodied this interpretation into seventeenth and eighteenth century English common law. After the adoption of the Federal Constitution, the two forms existed side-by-side, although the punishment thesis has been ascendant. Contempory American jurisprudence, nevertheless, has rediscovered the ancient Greco-Roman form of infamy which derived from acts of fraud and dishonesty affecting the public confidence. One of my intentions in this concurring opinion is to help recover that noble tradition which, I am convinced, is explicit in our own state constitutional values.

bribery or conspiracy to procure the absence of a witness, barratry, the fraudulent making or alteration of a writing to the prejudice of another man's right." In *Government of Virgin Islands v. Toto*, 529 F.2d 278, 281 (3d Cir.1976), it was held similarly that: "The specific contours of crimen falsi describes crimes involving, or at least relating to, communicative, often verbal, dishonesty; we have said that they are 'crimes which touch the question of the honesty of the witness.'"

There is a legal consensus that, as in the instant case, where disqualification for office arises from a conviction of an infamous crime, if the term "infamous" is not otherwise defined by statute, it has the same meaning as at common law. See for example, *Smith v. State*, 129 Ala. 89, 29 So. 699 (1900). For such specific purposes as imposing ineligibility for public office, finally, the common law also holds that any felony is an infamous crime if it involves mortal turpitude or commonly accepted principles of honesty and decency. *People ex rel. Keenan v. McGuane*, 13 Ill.2d 520, 150 N.E.2d 168, cert. den. 358 U.S. 828, 79 S.Ct. 46, 3 L.Ed.2d 67 (1958).

The power of a state to prescribe qualifications for office, moreover, is deeply entrenched in the statutes and the common law of this country, and there exists very little disagreement among the jurisdictions that a person convicted of an infamous crime is to be disqualified from holding public office.[2]

As indicated by the majority opinion, our legal sources on the subject, while somewhat sparse, have consistently main-

---

2. See, for example, *Huff v. Anderson*, 212 Ga. 32, 90 S.E.2d 329 (1955); *DeConcini v. Sullivan*, 66 Ariz 348, 188 P.2d 592 (1948); *Irby v. Day*, 182 Ark. 595, 32 S.W.2d 157 (1930); *Trent v. State*, 195 Tenn. 350, 259 S.W.2d 657 (1953); *Application of Marino*, 23 N.J.Misc. 159, 42 A.2d 469 (1945); *Rollins v. Gates*, 196 Misc. 770, 93 N.Y.S.2d 147 (1949). Numerous other cases from sister jurisdictions hold that a person convicted of an infamous crime can be prevented from voting (*Otsuka v. Hite*, 64 Cal.2d 596, 51 Cal.Rptr. 284, 414 P.2d 412 [1966]). A quo warranto proceeding is the usual method of determining whether an office should be vacated. A number of states have statutes disqualifying persons from such political positions as voters and office holders. See, 3 *Crim L. Bull*, 404 (1967).

tained that an act involving a violation of a rule of public trust likewise is grounds for disqualification from holding public office. In *Commonwealth v. Knox,* 172 Pa.Superior Ct. 510, 94 A.2d 128 (1953), affd on op. below, 374 Pa. 343, 97 A.2d 782 (Justice Musmanno, dissenting), it was held that the Constitution of Pennsylvania authorized removal from office upon a conviction "of misbehavior in office or of any infamous crime." [3] It was decided further in *Knox* and supporting cases that unfaithful public servants are subject to the "self-executing mandate ... for removal" even in the absence of statutory authority. *Also see, Commonwealth ex rel. v. Davis,* 299 Pa. 276, 149 A. 176 (1930), where this Court ruled that where an incumbent is convicted of an infamous crime not connected with the office he holds, there is no need for special legislation to deprive him of his position because the power of removal is inherently vested in the courts as a constitutional duty.

Upon the point being examined here, I am clear, in short, that in addition to simple constitutional authority there are good and sound reasons within the analytical framework of the common law to hold that an infamous crime includes criminal acts which transgress the general duties owed to a public office in such a way as to manifest a baseness that fatally implicates the future credibility of the officer. In this context, it is equally apparent to me that our legal norms require courts to remove officeholders and disqualify seekers from future elections. I need not draw further attention to the obvious predicate for this conclusion: our entire constitutional framework of government surely would unravel in the face of crumbling trust and proven dishonesty in public administration.

**3.** Under then Art. VI, § 4, it was provided that "All officers shall hold their office on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime." This language derived from the Pennsylvania Constitution of 1838, Art. VI, § 9. In *Commonwealth v. Zavada,* 26 Pa.D. & C. 551, 30 Luzerne Leg.Reg.R. 185 (1935) it was decided that persons found guilty of treason, common law felony, and all species of "crimen falsi" were ineligible to serve in any public office. Forgery is also an "infamous crime." *See, Wilner v. Lewis,* 13 Pa.D. & C. 560, 33 Dauphin County 35 (1929).

My last major concern is to reemphasize the constitutional right of a sovereign state to exclude from its offices persons convicted of infamous crimes by a federal court or sister courts. On this issue, there is a dearth of case law which has held uniformly that, providing that the classification of the crime meets state requirements for civil disqualification, a state is free to act against those who have been convicted in either federal courts or the courts of sister states. Persons have been rendered ineligible to vote or hold state public office for federal convictions of federal tax evasion, embezzlement of federal funds, conspiracy, mail robbery, assault, violation of federal liquor laws, etc.[4]

Under this analysis, I see no need to indulge in a somewhat strained effort to establish a state crime equivalent of a federal conviction in order to provide a basis upon which we can exercise our own sovereign right to establish qualifications for holding office. If we choose to maintain the purity of our public life by giving full recognition to convictions in foreign jurisdictions, that is our affair as a simple exercise of our sovereignty. One's fitness for public office is tainted equally by the crime of conspiracy, whether that conviction is rendered by a federal court or a sister jurisdiction. The state constitution has its own force as a breeder of values and a manifestation of sovereignty, and, as fundamental law it mandates that we judge for ourselves whether we want persons stigmatized by other courts to serve in Pennsylvania. I judge that we do not.

In this case, a public official of this state was convicted of a federal crime which involved criminal conduct violating his public trust. The nature of that violation constitutes an

4. For example: *State ex rel. Arpagaus v. Todd*, 225 Minn. 91, 29 N.W.2d 810 (1947); *State ex rel. Chavez v. Evans*, 79 N.M. 578, 446 P.2d 445 (1968); *State ex rel. Dean v. Haubrich*, 248 Iowa 978, 83 N.W.2d 451 (1957); *Hulgan v. Thornton*, 205 Ga. 753, 55 S.E.2d 115 (1949); *Marino*, supra, n. 2; and *Rollins v. Gates*, supra, n. 2. Other states which have followed this rule are Florida, Illinois, Mississippi, California, Oklahoma, Missouri, Alabama, Louisiana, Arkansas, and Indiana. *Marino*, supra, n. 2, and *Rollins v. Gates*, supra, n. 2, disqualified state voters upon conviction of conspiracy by federal courts.

infamous crime by our definition. We need go no further in deciding that it is our sovereign constitutional right to recognize that conviction in a foreign jurisdiction is a malignant stain on the public honor and integrity of a Pennsylvania official and bars him from public office.